PEOPLE v ELIASON

Docket No. 302353. Submitted January 9, 2013, at Grand Rapids. Decided April 4, 2013, at 9:05 a.m. Leave to appeal sought.

Dakotah W. Eliason was convicted by a jury in the Berrien Circuit Court of first-degree premeditated murder, MCL 750.316(1)(a), and possessing a firearm during the commission of a felony, MCL 750.227b(1), for fatally shooting his step-grandfather. The court, Scott Schofield, J., sentenced defendant, who was 14 years old when the crimes were committed, to life in prison without the possibility of parole. Defendant appealed.

The Court of Appeals *held*:

1. Defendant did not establish that he was denied the effective assistance of counsel. Defendant failed to overcome the presumption that counsel's decision to rebut the prosecution's evidence that he lacked remorse by impeaching the witnesses who testified to this effect and by highlighting evidence to the contrary rather than by presenting an expert witness was a matter of trial strategy. Defense counsel was also not ineffective by failing to object to the introduction of evidence that defendant had been reading about Charles Manson and had discussed capital punishment with a detective because it was relevant to show defendant's state of mind before and after the killing and was not unfairly prejudicial. Even if counsel should have objected to this evidence, defendant could not have established that prejudice resulted from its admission given the overwhelming evidence against him.

2. The trial court did not err by failing to suppress defendant's confessions to the police. The court's conclusion that defendant's waiver of his Fifth Amendment right against self-incrimination was knowing and intelligent was supported by the evidence that defendant appeared intelligent and articulate and twice told the detectives that he understood the nature of his rights. Further, a consideration of the additional safeguards for juveniles set forth in *People v Givans*, 227 Mich App 113 (1997), indicated that defendant's waiver was voluntary.

3. Defendant's mandatory sentence of life imprisonment without the possibility of parole constituted cruel and unusual punishment under *Miller v Alabama*, 567 US ___; 132 S Ct 2455 (2012)

and was therefore vacated. On remand for resentencing, in light of Michigan's first-degree-murder statutes, the court's discretion was limited to determining whether to impose a penalty of life imprisonment with or without the possibility of parole, and in making this decision, the trial court was to be guided by the nonexclusive list of factors set forth in *Miller* that apply when *sentencing a juvenile for a homicide offense.*

Convictions affirmed; sentence for the first-degree-murder conviction vacated; case remanded for resentencing.

Judge GLEICHER, *concurring in part and dissenting in part,* agreed with the result of the majority opinion, but wrote separately to express her belief that the Michigan Constitution forbade the trial court from resentencing defendant to imprisonment for life without the possibility of parole and that both the state and federal constitutions required the trial court to consider sentencing defendant to a term of years that would afford him a realistic opportunity for release.

1. CONSTITUTIONAL LAW — SENTENCING AND PUNISHMENT — HOMICIDE — JUVENILE OFFENDERS — CRUEL AND UNUSUAL PUNISHMENT.

Imposing a mandatory sentence of life imprisonment without the possibility of parole on a juvenile constitutes cruel and unusual punishment; when sentencing a juvenile for a homicide, a sentencing court must consider the factors that distinguish juveniles from adults generally and is to be guided by the following nonexclusive list of factors: (1) the character and record of the individual defendant and the circumstances of the offense, (2) the chronological age of the defendant, (3) the background and mental and emotional development of a youthful defendant, (4) the family and home environment, (5) the circumstances of the homicide offense, including the extent of the defendant's participation in the conduct and the way familial and peer pressure may have affected the defendant, (6) whether the defendant might have been charged with and convicted of a lesser offense if not for incompetencies associated with youth, and (7) the defendant's potential for rehabilitation (US Const, Am VIII; Const 1963, art 1, § 16; MCL 750.316[1][a]; MCL 769.1[1][g]; MCL 791.234[6][a]).

2. CONSTITUTIONAL LAW — SENTENCING AND PUNISHMENT — FIRST-DEGREE MURDER — JUVENILE OFFENDERS CRUEL AND UNUSUAL PUNISHMENT — SENTENCING DISCRETION.

When sentencing a juvenile convicted of first-degree murder, a trial court's discretion is limited to determining whether to impose a penalty of life imprisonment with or without the possibility of

parole (US Const, Am VIII; Const 1963, art 1, § 16; MCL 750.316[1][a]; MCL 769.1[1][g]; MCL 791.234[6][a]).

*Bill Schuette*, Attorney General, *John J. Bursch*, Solicitor General, *Arthur J. Cotter*, Prosecuting Attorney, and *Elizabeth A. Wild*, Assistant Prosecuting Attorney, for the people.

State Appellate Defender (by *Jonathan Sacks*) for defendant.

Before: GLEICHER, P.J., and O'CONNELL and MURRAY, JJ.

MURRAY, J. Defendant appeals as of right his convictions for first-degree premeditated murder, MCL 750.316(1)(a), and possession of a firearm during the commission of a felony, MCL 750.227b(1). Defendant, who was 14 years old at the time he committed these crimes, was sentenced to mandatory life in prison without the possibility of parole for his first-degree murder conviction and two years' imprisonment for his felony-firearm conviction. We affirm defendant's convictions but remand for resentencing on his first-degree premeditated murder conviction in accordance with this opinion.

## I. FACTS

The material facts of this case were essentially undisputed, and at trial those facts revealed the following course of events. On March 5, 2010, defendant, along with his sister, went to spend the weekend at the home of Jean and Jesse "Papa" Miles, their grandmother and step-grandfather. Defendant often spent weekends at his grandparents' home. Jean described defendant as a "good grandson," and testified that she and Jesse had

always been involved in defendant's life. She explained that defendant had a "good" relationship with her and Jesse, and that nothing appeared to be out of the ordinary during this particular weekend.

On March 6, 2010, defendant's sister returned to their father's home while defendant remained at his grandparents' house. Jean saw defendant during the evening and briefly spoke with him when he came downstairs to use the restroom; defendant did not at the time appear angry or upset. At approximately 7:30 p.m. that evening, Jean went to her bedroom to watch television; Jesse was in the living room, where he slept, watching television. Defendant was in an upstairs bedroom.

Jean awoke at approximately 3:00 a.m. the next morning when she heard a "pop." Upon awakening, she heard defendant's voice, and thought defendant told her, "I shot Papa." The next thing she remembered was that she had a gun in her hands; she could not recall whether defendant gave her the gun or whether she picked it up. After discovering what happened, she instructed defendant to call 9-1-1, and paramedics responded to the call but were unable to save Jesse.

Michigan State Police Trooper Brenda Kiefer[1] and Deputy Eugene Casto of the Berrien County Sheriff's Department responded to the scene and arrested defendant. Kiefer initially interviewed defendant at the home; she read defendant his *Miranda*[2] warnings and defendant agreed to waive his rights and to speak to her without having a parent present.[3] Defendant told Kiefer

---

[1] Kiefer's name appears in the trial transcripts as "Keifer."

[2] *Miranda v Arizona*, 384 US 436, 444; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

[3] Kiefer described defendant as "respectful" during the interview. As to defendant's demeanor, Kiefer testified that defendant "was very matter

that late in the evening on March 6 or early in the morning on March 7, he went downstairs to get a handgun that Jesse kept on the hook of a coat rack. Afterwards, defendant went back up to his room and sat in a chair with the gun for approximately two to three hours. While he sat upstairs with the gun, defendant "was contemplating homicide or suicide." Defendant told Kiefer that he went downstairs and shot Jesse with the handgun while he was sleeping on the couch. Although defendant told Kiefer that he shot Jesse out of "sadness" and "pent up anger," he was not angry with Jesse or Jean, but instead was angry with his own parents.

Defendant also spoke with Casto on the night of his arrest as defendant sat in Casto's patrol car.[4] Among other things, defendant informed Casto that he neglected to tell Kiefer about two knives he had placed in the living room near the staircase, and that he realized that his "life just turned into Law & Order, but without commercials." Additionally, in referencing the killing, defendant stated, "[y]ou know I wish I could take it back but now I understand the feeling that people get when they do that. Now I understand how they feel." Continuing, defendant commented to Casto about the feeling, "when you hit that point of realization for that split second you feel like nothing could ever hurt you. Just for that split second. Once you realize what you've done." Defendant also described to Casto a paper his father, Steven Eliason, had written for a criminology class about various forms of execution.[5]

of fact and showed no emotion or remorse for what happened. And he had a steady, calm voice when he answered all of my questions."

[4] The patrol car was equipped with a camera and defendant's statements to Casto were recorded and played for the jury at trial.

[5] According to Casto, during this conversation defendant "seemed basically kind of calm; [he] was not upset, [and he] didn't show any signs

Shortly thereafter, defendant was brought to a police station for interrogation by Detective Fabian Suarez. With everyone's permission, Eliason was present during some portions of the interview, but was not in the same room as defendant and Suarez for the entire interview. During the interview, Eliason and defendant acknowledged that they understood the *Miranda* warnings and defendant agreed to waive his rights. Defendant explained to Suarez that he had not slept much before the shooting, and that he shot Jesse after taking the loaded handgun from the coat rack. He could not explain why he shot Jesse, and indicated that Jesse never harmed him physically or emotionally. However, defendant indicated that he was contemplating either committing suicide or shooting Jesse that night, but decided to kill Jesse because he was not ready to die. And, in a sense admitting to a self-awareness of his actions, defendant stated that at one point he thought to himself, "what am I doing, why do I have to do this, why do I have the gun, I know better than this . . . ."

As to the shooting, defendant was in the living room looking at Jesse for approximately 45 minutes trying to decide what to do before he shot Jesse. Defendant then aimed the gun at Jesse from approximately seven feet away and pulled the trigger, shooting him in the head.[6] Defendant had not previously considered hurting Jesse, but "[s]omething snapped" that night because everything he had been thinking of that evening "just buil[t] up to the point that you don't know what you're doing."

---

of remorse to me, didn't cry at all. [He] [w]as more inquisitive on what was going on than what may happen."

[6] Defendant told Suarez that he considered using knives rather than the gun because he was not sure whether he wanted the killing to be quiet or loud. Defendant also considered using either a pillow to smother Jesse or washcloths to gag him.

According to defendant he "blacked out for a couple minutes" before he shot Jesse.

With these essential facts in mind we now turn to defendant's challenges to his convictions and sentences.

## II. ANALYSIS

### A. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant first argues that he was denied the effective assistance of trial counsel because his trial counsel should have presented an expert witness to rebut testimony offered by the prosecution that he lacked remorse after the shooting. At a *Ginther*[7] hearing on this matter, Dr. James Henry testified that defendant experienced significant emotional trauma before the shooting and that this caused him to dissociate from reality. As a result, defendant often had trouble expressing his feelings, including remorse. Defendant contends that his trial counsel was ineffective for failing to call an expert witness, such as Dr. Henry, to explain his alleged lack of remorse.

A defendant is denied the effective assistance of counsel in violation of the Sixth Amendment of the United States Constitution if "counsel's performance fell below an objective standard of reasonableness . . . [and] the representation so prejudiced the defendant as to deprive him of a fair trial." *People v Pickens*, 446 Mich 298, 309; 521 NW2d 797 (1994). This Court presumes that trial counsel was effective, and in order to show that counsel's performance fell below an objective standard of reasonableness, a defendant must overcome the strong presumption that his counsel's conduct constituted reasonable trial strategy. *People v*

---

[7] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

*Carbin*, 463 Mich 590, 600; 623 NW2d 884 (2001). "An attorney's decision whether to retain witnesses, including expert witnesses, is a matter of trial strategy." *People v Payne*, 285 Mich App 181, 190; 774 NW2d 714 (2009).

Defendant cannot overcome the presumption that his trial counsel's decision not to call an expert witness was the product of trial strategy. Rather than calling an expert witness, defendant's trial counsel attempted to rebut the prosecution's arguments that defendant lacked remorse by impeaching witnesses who testified that defendant lacked remorse, and highlighting evidence that arguably showed defendant did have remorse. This Court will not second-guess trial counsel's strategy to rebut the evidence in this manner rather than calling an expert witness. *People v Cooper*, 236 Mich App 643, 658; 601 NW2d 409 (1999). Just as importantly, we cannot conclude that defendant's trial counsel performed in an objectively unreasonable manner when the record reveals that he consulted with three mental health experts before trial, none of whom concluded that defendant's lack of remorse was caused by dissociation with reality. Although these experts evaluated defendant for purposes of raising an insanity defense or for mitigating the killing, they nonetheless concluded that defendant did not suffer from a mental health disorder. We cannot hold that trial counsel was constitutionally ineffective by not seeking out a fourth expert witness when the first three he consulted did not indicate that defendant suffered from an underlying mental health condition that caused him to appear to lack remorse for his actions. The record unequivocally shows that trial counsel thoroughly examined options regarding the use of expert witnesses and what, in the end, would be the best trial strategy. His performance

on behalf of defendant was anything but ineffective as defined by the Supreme Court.

However, defendant also argues that his trial counsel was ineffective for failing to object to irrelevant and prejudicial evidence, as well as the prosecutor's argument that utilized that evidence. Defendant notes that the prosecution introduced evidence—without objection from his counsel—of his conversation with Deputy Casto in which he espoused his views on capital punishment, and told Casto about a criminology paper his father had written that discussed various forms of execution.

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401. "Alternatively stated, the general rule is that evidence is admissible if helpful in throwing light upon any material point in issue." *People v Murphy (On Remand)*, 282 Mich App 571, 580; 766 NW2d 303 (2009) (quotation marks and citation omitted). "A material fact is one that is 'in issue' in the sense that it is within the range of litigated matters in controversy." *Id.* (quotation marks and citation omitted). Pursuant to MRE 402, "[a]ll relevant evidence is admissible," unless it is otherwise deemed inadmissible. Here, defendant's statements to Casto were relevant to a matter in controversy because they tended to show defendant's state of mind prior to the killing. Given that the statements were made shortly after defendant shot Jesse, they were relevant to prove the issue of premeditation because they demonstrate that defendant considered the consequences of killing before he committed the murder. Those statements also showed that soon after the killing, defendant was able to clearly articulate thoughts, even about matters associated with killing and punishment.

Defendant's trial counsel was not ineffective for failing to raise a meritless objection. *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010).

Defendant also contends that his trial counsel should have moved to exclude his statements to Casto under MRE 403 because the probative value of this evidence was substantially outweighed by the danger of unfair prejudice. An analysis under MRE 403 requires balancing several factors, *People v Blackston*, 481 Mich 451, 462; 751 NW2d 408 (2008), which include

> the time required to present the evidence and the possibility of delay, whether the evidence is needlessly cumulative, how directly the evidence tends to prove the fact for which it is offered, how essential the fact sought to be proved is to the case, the potential for confusing or misleading the jury, and whether the fact can be proved in another manner without as many harmful collateral effects. [*Id.*]

The mere fact that evidence is damaging to a defendant does not make the evidence *unfairly* prejudicial. *Murphy (On Remand)*, 282 Mich App at 582-583.

In consideration of these factors, we conclude that any objection to defendant's statements about capital punishment under MRE 403 would have been unsuccessful. Although a slight danger existed that the jury might have been misled by comments about capital punishment, the evidence nonetheless tended to show that defendant acted with premeditation and the evidence was not particularly inflammatory. Therefore, trial counsel was not ineffective for failing to raise an objection to the evidence or to the prosecutor's argument as any such objections would have been meritless. *Ericksen*, 288 Mich App at 201. Relative to the prosecutor's reference to Charles Manson, although the prosecutor's question was irrelevant and his comments during closing arguments improper, defendant's trial

counsel's performance did not fall below an objective standard of reasonableness by failing to raise an objection. Defendant's trial counsel, as an experienced attorney, "was certainly aware that there are times when it is better not to object and draw attention to an improper comment." *People v Unger*, 278 Mich App 210, 242; 749 NW2d 272 (2008) (quotation marks and citation omitted). "Furthermore, declining to raise objections, especially during closing arguments, can often be consistent with sound trial strategy." *Id.*

Nevertheless, even if trial counsel acted in an objectively unreasonable manner by failing to object to this evidence, defendant would not be entitled to relief because he cannot demonstrate prejudice. *Carbin*, 463 Mich at 600. Indeed, even if this evidence had been excluded, the prosecution presented overwhelming evidence of defendant's guilt. The prosecution introduced evidence that defendant admitted to pondering the killing for approximately two to three hours, and that he sat in the living room next to Jesse for approximately 45 minutes as he contemplated what to do. Further, defendant told police officers that he pondered whether to use knives, a gun, or even a pillow. Given the amount of contemplation and planning by defendant, there is overwhelming evidence that he had more than a "sufficient time to . . . take a second look" and that he was guilty of first-degree premeditated murder. *People v Jackson*, 292 Mich App 583, 588; 808 NW2d 541 (2011) (quotation marks and citation omitted).

## B. WAIVER OF DEFENDANT'S FIFTH AMENDMENT RIGHT AGAINST SELF-INCRIMINATION

Defendant also challenges the trial court's failure to suppress his confessions to Kiefer and Suarez because,

although he waived his Fifth Amendment rights[8] before giving his confessions, his waivers were neither knowing nor voluntary. Defendant preserved this issue for appeal by challenging the admissibility of his statements in a pretrial motion. *Unger*, 278 Mich App at 243. "We review de novo a trial court's determination that a waiver was knowing, intelligent, and voluntary." *People v Gipson*, 287 Mich App 261, 264; 787 NW2d 126 (2010). However, we defer to the trial court's factual findings so long as they are not clearly erroneous. *People v Herndon*, 246 Mich App 371, 395; 633 NW2d 376 (2001). "[T]he analysis must be bifurcated, i.e., considering (1) whether the waiver was voluntary, and (2) whether the waiver was knowing and intelligent." *People v Tierney*, 266 Mich App 687, 707; 703 NW2d 204 (2005). Whether a waiver is knowing and intelligent "requires an inquiry into [a] defendant's level of understanding, irrespective of police conduct." *Gipson*, 287 Mich App at 265. "A defendant does not need to understand the consequences and ramifications of waiving his or her rights. A very basic understanding of those rights is all that is necessary." *Id.* Meanwhile, whether the waiver was voluntary depends on the absence of police coercion; the defendant's waiver must be his or her own "free and deliberate choice," rather than the product of intimidation. *Id.* at 264-265.

Initially, we conclude that record evidence supported all of the trial court's findings, so we use those facts in analyzing the legal issues presented. In doing so, we hold that defendant knowingly and intelligently waived his right against self-incrimination after his *Miranda*

---

[8] The warnings required by *Miranda* do not grant independent rights to defendant. Rather, *Miranda* warnings are measures taken to provide "practical reinforcement" of a defendant's Fifth Amendment rights. *Michigan v Tucker*, 417 US 433, 444; 94 S Ct 2357; 41 L Ed 2d 182 (1974).

warnings because the totality of the circumstances demonstrates that defendant understood his rights. Kiefer and Suarez testified that defendant appeared intelligent and articulate and that he twice stated he understood the nature of his rights. Although defendant was only 14 years old, the record reveals that he performed well in school. Additionally, the trial court rejected defendant's testimony at the suppression hearing that he did not understand his rights, finding that defendant was not credible as he was unable to articulate exactly what he did not understand about his rights. We defer to the trial court's credibility determinations. *Gipson*, 287 Mich App at 264. Because the trial court found that defendant appeared intelligent and articulate and that he twice indicated he understood his rights, we cannot hold that his waiver was not knowing and intelligent. See *People v Abraham*, 234 Mich App 640, 649-650; 599 NW2d 736 (1999); *People v Fike*, 228 Mich App 178, 182; 577 NW2d 903 (1998).

We likewise reject defendant's argument that his waivers were involuntary. The voluntariness of a *Miranda* waiver is evaluated under a totality of the circumstances test, but also includes additional safeguards for juveniles. *In re SLL*, 246 Mich App 204, 209; 631 NW2d 775 (2001); *People v Givans*, 227 Mich App 113, 121; 575 NW2d 84 (1997). In *Givans*, 227 Mich App at 121, this Court explained that the trial court must consider extra factors in deciding whether a juvenile's waiver was voluntary:

> (1) whether the requirements of *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966), have been met and the defendant clearly understands and waives those rights, (2) the degree of police compliance with MCL 764.27; MSA 28.886 and the juvenile court rules, (3) the presence of an adult parent, custodian, or guardian, (4) the juvenile defendant's personal background, (5) the ac-

cused's age, education, and intelligence level, (6) the extent of the defendant's prior experience with the police, (7) the length of detention before the statement was made, (8) the repeated and prolonged nature of the questioning, and (9) whether the accused was injured, intoxicated, in ill health, physically abused or threatened with abuse, or deprived of food, sleep, or medical attention.

Considering the factors articulated in *Givans*,[9] and keeping in mind the deference we give to the trial court's findings of fact, we hold that defendant voluntarily waived his Fifth Amendment rights before he spoke with Kiefer and Suarez. Regarding the first factor, the officers complied with *Miranda*'s requirements and defendant understood his *Miranda* rights.[10] As to the third factor, Eliason was present during defendant's interview with Suarez, and although he was not present during defendant's interview with Kiefer, that was at defendant's request.

Likewise, we find nothing in the next three factors— defendant's background, age, education, intelligence, and the extent of his prior experience with the police—to suggest that defendant's waiver was involuntary. Kiefer described defendant as "intelligent and articulate," and Suarez opined that defendant was "probably above average [intelligence] for his age . . . ." Additionally, the record reveals that defendant earned mostly A's and B's in school, and that he did not have difficulty understanding the police officers who interviewed him. Further, defendant had some familiarity with the police as a result of prior questioning by police officers on another occasion.

---

[9] When rendering its decision on defendant's motion to suppress, the trial court thoroughly examined all of these factors.

[10] Defendant does not challenge the second *Givans* factor, compliance with MCL 764.27.

The remaining three factors—the length of the detention, the nature of the questioning, and whether defendant was coerced, threatened, or deprived of food, water, sleep, or medical attention—also support the conclusion that defendant's waivers were voluntary. Neither the detention nor the questioning in this case was prolonged, as defendant confessed to Kiefer almost immediately after he was arrested. His subsequent confession to Suarez followed approximately two hours later. Moreover, there is no indication in the record, nor does defendant allege, that Kiefer or Suarez coerced or threatened him into making a confession and waiving his rights. Although defendant notes that he had not slept for a considerable amount of time before the interviews, the officers testified that defendant was articulate and that he did not have difficulty answering their questions. Accordingly, in light of each of the factors noted above, we hold that defendant's waivers were voluntary. See *Givans*, 227 Mich App at 122; *People v Good*, 186 Mich App 180, 189; 463 NW2d 213 (1990).[11]

## C. CRUEL AND UNUSUAL PUNISHMENT

Defendant's final argument[12] is that his mandatory sentence of life imprisonment without the possibility of

---

[11] Additionally, we reject defendant's contention that Eliason exerted pressure on him and coerced him into confessing to Suarez. The record reveals that defendant confessed to Suarez at the outset of the interview; Eliason did not speak with defendant or ask him any questions until after defendant already confessed. Any claim that Eliason forced defendant to confess is disingenuous.

[12] We note that defendant initially argued that he was entitled to a new trial because the trial court violated his right to due process by shackling him at trial. Defendant expressly abandoned this issue after the prosecution presented evidence at a posttrial evidentiary hearing that none of the jurors saw defendant's shackles.

parole is cruel and unusual punishment under US Const, Am VIII and Const 1963, art 1, § 16. At sentencing, the trial court imposed a mandatory sentence of life without the possibility of parole pursuant to MCL 750.316(1), MCL 769.1(1)(g), and MCL 791.234(6)(a). Defendant preserved this issue by raising it at his sentencing hearing. *People v Pipes*, 475 Mich 267, 277; 715 NW2d 290 (2006). "This Court reviews constitutional questions de novo." *People v Dipiazza*, 286 Mich App 137, 144; 778 NW2d 264 (2009).

In *Miller v Alabama*, 567 US ___; 132 S Ct 2455, 2469; 183 L Ed 2d 407 (2012), the United States Supreme Court ruled "that the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders."[13] The *Miller* Court noted that juveniles and adults are different for purposes of sentencing, and explained that sentencing schemes that *mandate* life without parole for juveniles convicted of homicide offenses do not take into account a juvenile's individual characteristics and thus are unconstitutional. *Id.* at ___; 132 S Ct at 2466-2469. The Court added:

> [T]he mandatory penalty schemes at issue here prevent the sentencer from taking account of these central considerations. By removing youth from the balance—by subjecting a juvenile to the same life-without-parole sentence applicable to an adult—these laws prohibit a sentencing authority from assessing whether the law's harshest term of imprisonment proportionately punishes a juvenile offender. That contravenes . . . [the] foundational principle [found in *Graham v Florida*, 560 US 48; 130 S Ct 2011; 176 L Ed 2d 825 (2010), and *Roper v Simmons*, 543 US 551; 125

---

[13] The Eighth Amendment of the United States Constitution provides the following guarantees: "Excessive bail shall not be required, not excessive fines imposed, nor cruel and unusual punishments inflicted." US Const, Am VIII.

S Ct 1183; 161 L Ed 2d 1 (2005)]: that imposition of a State's most severe penalties on juvenile offenders cannot proceed as though they were not children. [*Id.* at ___; 132 S Ct at 2466.]

In *People v Carp*, 298 Mich App 472, 526-527; 828 NW2d 685 (2012) this Court explained that the limited holding in *Miller* was that a juvenile cannot be *automatically* subjected to a punishment of life imprisonment without the possibility of parole. The holding of *Carp*, however, was that *Miller* did not apply retroactively to collateral challenges to sentences. *Id.* at 522. Here, defendant's case was pending on direct review at the time *Miller* was decided; therefore, *Miller* applies and defendant's mandatory sentence of life imprisonment without the possibility of parole constitutes cruel and unusual punishment under the Eighth Amendment. *Id.*

However, contrary to defendant's assertions, he is not entitled to a remand at which the trial court has unfettered discretion to impose a sentence for any term of years. In fact, he could still receive the same sentence on remand, as the *Miller* Court did not "foreclose a sentencer's ability" to sentence a juvenile in a homicide case to life imprisonment without parole, so long as the sentence "take[s] into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." *Id.* at ___; 132 S Ct at 2469. In other words, a trial court can still sentence a juvenile who committed a homicide to life in prison without the possibility of parole, so long as that sentence is an individualized one that takes into consideration the factors outlined in *Miller*. *Id.* at ___; 132 S Ct at 2466-2467, 2471. We recognized as much in *Carp*, 298 Mich App at 525, where we opined in dicta that the rule from *Miller* "does not . . . imply that a sentencing court has unfettered discretion when sen-

tencing a juvenile. Rather, the focus is on the discretion of the sentencer to determine whether to impose the harshest penalty of life without the possibility of parole on a juvenile convicted of a homicide offense."

Therefore, the only discretion afforded to the trial court in light of our first-degree murder statutes and *Miller* is whether to impose a penalty of life imprisonment without the possibility of parole or life imprisonment with the possibility of parole. *Carp*, 298 Mich App at 527. In deciding whether to impose a life sentence with or without the possibility of parole, the trial court is to be guided by the following nonexclusive list of factors:

> (a) the character and record of the individual offender [and] the circumstances of the offense, (b) the chronological age of the minor, (c) the background and mental and emotional development of a youthful defendant, (d) the family and home environment, (e) the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressure may have affected [the juvenile], (f) whether the juvenile might have been charged [with] and convicted of a lesser offense if not for incompetencies associated with youth, and (g) the potential for rehabilitation. [*Id.* at 532, citing *Miller*, 567 US at ___; 132 S Ct at 2467-2468 (quotation marks and citations omitted).]

As the prosecutor has noted, under MCR 6.425(E)(1), a trial court is already required to hold a sentencing hearing, and so this remedy—rather than the one suggested by defendant[14]—is expressly permitted by

---

[14] Defendant proposes that the most palatable remedy consistent with the role of the judiciary is to vacate his first-degree murder conviction and remand for entry of a second-degree murder conviction, which allows for a term-of-years sentence. However, the cases defendant relies upon provide that specific remedy when the conviction was not based on sufficient facts for the higher charged crime. That is not what we are

court rule and is not an unconstitutional trip by the judiciary into the legislative realm. We therefore vacate defendant's mandatory sentence of life without the possibility of parole and remand for an individualized sentence within the strictures of *Miller*.

Our dissenting colleague is of the opinion that (1) under the federal constitution as interpreted in *Miller* a trial court has complete freedom to resentence a juvenile to any sentence, except those actually provided for by the Legislature, and (2) that a sentence of life *with* the possibility of parole is cruel or unusual punishment under Const 1963, art 1, § 16. With all due respect, we explain below why we disagree with these propositions.

### 1. *MILLER* AND THE SEPARATION OF POWERS

The dissent argues that our application (consistent with the dicta of *Carp*) of *Miller*'s holding—i.e., that the appropriate sentencing remedy is to remand for a life sentence, with the trial court exercising discretion as to whether the sentence should be with or without the possibility of parole—is too narrow. Instead, relying on *Miller*, the dissent would create a rule providing trial courts with the "discretion to fashion a sentence that takes into account an offender's youth . . . ." Essentially the dissent would give unfettered discretion (except for use of *Miller*'s criteria) to trial courts when sentencing juveniles lawfully convicted of first-degree premeditated murder. But in coming to this conclusion, the dissent has failed to heed (1) the actual holding of *Miller*, (2) the context in which *Miller*'s ruling was made, and (3) the Michigan Legislature's judgment of the appropriate punishment for first-degree murderers.

---

faced with here, as overwhelming facts supported the first-degree-murder conviction. To do as suggested by defendant would require us to ignore the jury findings and the prosecutor's charging discretion.

There is no disagreement that *Miller* provides the precedent for addressing whether defendant's current sentence—one that was mandatorily imposed—is constitutionally valid under the federal constitution. But precedent, of course, has its limitations. As one court has accurately stated:

> The essence of the common law doctrine of precedent or *stare decisis* is that the rule of the case creates a binding legal precept. The doctrine is so central to Anglo-American jurisprudence that it scarcely need be mentioned, let alone discussed at length. A judicial precedent attaches a specific legal consequence to a detailed set of facts in an adjudged case or judicial decision, which is then considered as furnishing the rule for the determination of a subsequent case involving identical or similar material facts and arising in the same court or a lower court in the judicial hierarchy. [*Allegheny Gen Hosp v NLRB*, 608 F2d 965, 969-970 (CA 3, 1979) abrogated on other grounds *St Margaret Mem Hosp v NLRB*, 991 F2d 1146 (CA 3, 1993) (footnote omitted).]

At the outset of her opinion, Justice Kagan made clear the holding in *Miller*: "We . . . hold that mandatory life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on 'cruel and unusual punishments.' " *Miller*, 567 US at ___; 132 S Ct at 2460.[15] That holding was necessarily limited by the fact that the Court was reviewing the validity of statutes enacted in Alabama and Arkansas that *required* the sentence of life without the possibility of parole without a trial court considering *any* factors unique to the defendant

___

[15] Though the limited nature of the *Miller* holding is abundantly clear, we point out that numerous other state courts have recently made the same observation as we do today. See, e.g., *Conley v State*, 972 NE2d 864, 879 (Ind, 2012); *State v Williams*, 108 So3d 1169 (La, 2013); *State v Riley*, 140 Conn App 1, 13-16; 58 A3d 304 (2013) lv gtd in part 308 Conn 910 (2013).

and his crime. Justice Kagan was equally specific when she declared for the Court that it was not invalidating discretionary life-without-parole sentences imposed on juveniles convicted of murder: "Because that holding is sufficient to decide these cases, we do not consider . . . [the] alternative argument that the Eighth Amendment requires a categorical bar on life without parole for juveniles, or at least for those 14 and younger." *Id.* ___; 132 S Ct at 2469. Importantly, the *Miller* Court did not strike down the statutes in their entirety, but instead merely ruled that their mandatory nature violated the Eighth Amendment when applied to juveniles.

As a result of *Miller*'s limited holding, the state statutes under which the trial court sentenced defendant to life in prison without the possibility of parole— MCL 750.316(1)(a), MCL 769.1(1)(g), and MCL 791.234(6)(a)—cannot on remand *mandate* the same sentence. Instead, the trial court is required to consider the factors surrounding defendant's age when exercising the discretion to determine whether the same sentence should be imposed again. *Miller* requires nothing more, and certainly did not invalidate the Michigan Legislature's judgment that a life sentence is the appropriate punishment for a juvenile who is lawfully convicted of first-degree murder.[16]

Contrary to the dissent's view, the *Miller* Court's recitation of factors it considered relevant to youth did

---

[16] It is true, as the dissent states, that no statute provides life with parole as a punishment for first-degree murder. However, life in prison without parole is still the legislatively prescribed punishment for this most heinous crime, and can still be the sentence for a juvenile. But, as we have exhaustively discussed, *Miller* requires discretion when determining whether a juvenile should be sentenced to this most severe penalty. If a juvenile should not receive life without parole, certainly life with parole is the sentence most consistent with the Legislature's declared punishment.

not create a new mandatory sentencing guideline in place of sentencing statutes like those at issue here. Rather, because it was addressing whether *mandatory* life in prison without the possibility of parole was constitutional, the *Miller* Court recited factors that distinguish juveniles from adults both as evidence of what important factors could not be considered under these mandatory schemes and to provide guidance to lower courts when determining if "a State's most severe penalties on juvenile offenders" should be imposed:

> But the *mandatory penalty schemes* at issue here prevent the sentencer from taking account of these central considerations. *By removing youth from the balance*—by subjecting a juvenile to the same life-without-parole sentence applicable to an adult—*these laws* prohibit a sentencing authority from assessing whether the *law's harshest term of imprisonment* proportionately punishes a juvenile offender. That contravenes *Graham's* (and also *Roper's*) foundational principle: that imposition of a State's most severe penalties on juvenile offenders cannot proceed as though they were not children. [*Miller*, 567 US at ___; 132 S Ct at 2466 (emphasis added).]

See, also, *id*. at ___; 132 S Ct at 2467 ("Such mandatory penalties, by their nature, preclude a sentencer from taking account of an offender's age and the wealth of characteristics and circumstances attendant to it."). We reemphasize, then, by repeating that *Miller* did "not foreclose a sentencer's ability to make that judgment [life without parole] in homicide cases," but instead merely required sentencing courts "to take into account how children are different, and how those differences counsel against *irrevocably* sentencing them to a lifetime in prison." *Id*. at ___; 132 S Ct at 2469 (emphasis added).

The dissent fails to acknowledge this specific holding, and the context within which the *Miller* Court reached

it. Yes, the factors that come into play when sentencing juveniles are important, but *Miller* only requires those to be considered when the juvenile is convicted of murder *and* the state's "most severe penalty" is being considered, i.e., life without the possibility of parole. Just last month the Wyoming Supreme Court, in *Bear Cloud v State*, 2013 Wy 18, ¶ 44; 294 P3d 36, 47 (Wy, 2013), recognized this same point:

> In sum, *Miller* requires an individualized sentencing hearing for every juvenile convicted of first-degree murder at which the sentencing court must consider the individual, the factors of youth, and the nature of the homicide in determining whether to order a sentence that includes the possibility of parole. *Miller* does not guarantee the possibility of parole for a convicted juvenile homicide offender, but *Miller* does mandate that a meaningful review and consideration be afforded by the sentencing court.

The *Miller* Court was unquestionably *not* offering these factors so that courts could fashion *any* sentence for a juvenile, which is made clear by the limited holding and issue before that Court.

But that is what is urged by the dissent, and in doing so it is stretching *Miller* well beyond the precedent that it established. Perhaps granting trial courts wide discretion in sentencing a juvenile would be good policy (though we certainly offer no opinion on that subject), but as of today Michigan law—in conjunction with *Miller*—is clear as to what sentences can be imposed upon a juvenile for a first-degree-murder conviction. If a different policy decision is to be made regarding the appropriate sentences for juveniles convicted of murder, it is best "to allow the legislative process to work than to engage in an expansive and unnecessary interpretation of *Miller*." *State v Riley*, 140 Conn App 1, 15 n 8; 58 A3d 304 (2013), lv gtd in part 308 Conn 910 (2013). Again, *Miller* unquestionably did *not* invalidate state

statutes when construed (pursuant to *Miller*) to *allow*
first-degree murderers to be sentenced to life in prison
without parole, and so we must continue to enforce our
Legislature's policy choice in that regard, see *Davis v
Detroit Financial Review Team*, 296 Mich App 568,
628-629; 821 NW2d 896 (2012) (O'CONNELL, J., concur-
ring in part and dissenting in part) (recognizing the
inherent limitations on the judiciary under the separa-
tion of powers).

### 2. THE STATE CONSTITUTION

Defendant and the dissent also argue that a sentence
of life in prison with *or without* the possibility of parole
runs afoul of our state constitution's prohibition
against "cruel or unusual punishment[.]" Const 1963,
art 1, § 16. It is certainly true that this state provision,
with the use of "or" rather than the Eighth Amend-
ment's prohibition containing "and," has been inter-
preted more broadly than the federal prohibition.
*People v Bullock*, 440 Mich 15, 30; 485 NW2d 866
(1992).[17] However, because it is unknown what sentence
on remand will be imposed upon defendant, and for
what reasons, it is best to leave this issue to another
day. See *People v Oswald (After Remand)*, 188 Mich App
1, 12-13; 469 NW2d 306 (1991). Nevertheless, because

---

[17] We note that the *Bullock* Court's use of a proportionality analysis for
determining whether a sentence constitutes cruel or unusual punish-
ment was eloquently challenged in a dissent written by Justice RILEY, see
*Bullock*, 440 Mich at 46-67, and has been more recently called into
question on those same grounds. *People v Correa*, 488 Mich 989, 989-992
(2010) (MARKMAN, J., joined by YOUNG and CORRIGAN, JJ., concurring). The
issues raised by Justice RILEY address what is the required test under
Const 1963, art 1, § 16. No one questions the principle that the Michigan
Constitution trumps an inconsistent statute, or that the judiciary is
empowered to declare when such a conflict exists. *Marbury v Madison*, 5
US (1 Cranch) 137, 177; 2 L Ed 60 (1803).

the dissent has gone to great lengths in addressing this issue, we feel compelled to offer a few comments on the subject.

Our dissenting colleague concludes, based primarily on *Bullock* and *People v Lorentzen*, 387 Mich 167; 194 NW2d 827 (1972), that the Michigan Legislature cannot constitutionally set the punishment of life in prison with or without the possibility of parole for a juvenile convicted of first-degree murder. To reach this result, the dissent employs the vague and subjective proportionality tests set forth in those cases, while failing to note caselaw that tends to preclude the conclusion reached.

For example, it is well settled that "[l]egislatively mandated sentences are presumptively proportional and presumptively valid." *People v Brown*, 294 Mich App 377, 390; 811 NW2d 531 (2011). Nowhere does the dissent mention these constitutionally important presumptions. Likewise, how can it be that our state constitution prohibits a sentence for a juvenile of life *with* parole when our Supreme Court has held that life *without* parole is constitutional for the crimes of felony-murder and conspiracy to commit murder? See *People v Hall*, 396 Mich 650, 657-658; 242 NW2d 377 (1976) and *People v Fernandez*, 427 Mich 321, 335; 398 NW2d 311 (1986). One reason why the *Hall* Court rejected the state constitutional challenge was because defendant had not shown that "Michigan's punishment for felony murder is widely divergent from any sister jurisdiction." *Hall*, 396 Mich at 658. Nowhere does the dissent address this relevant factor.[18] See *Bullock*, 440 Mich at 33-34 (recognizing under *Lorentzen* that how other

---

[18] *Miller* recognized, however, that 29 jurisdictions (28 states and the federal government) provided life *without* parole for some juveniles convicted of murder. *Miller*, 567 US at ___; 132 S Ct at 2471.

states penalize the conduct must be considered in the proportionality analysis); *Brown*, 294 Mich App at 390 (how other states penalize similar conduct must be considered in the state constitutional analysis); *People v Launsburry*, 217 Mich App 358, 363; 551 NW2d 460 (1996) (same). Finally, our Supreme Court in *People v Lemons*, 454 Mich 234, 258-259; 562 NW2d 447 (1997), rejected an argument that an offender's young age, by itself, renders a particular sentence disproportionate.[19]

It is apparent that the dissent believes that it is immoral to punish a juvenile for murder with a life sentence, even when given the chance of parole. As explained earlier, the *Miller* Court failed to invalidate *all* juvenile life sentences with no chance of parole, and failed to address juvenile life sentences *with* the opportunity for parole. Moreover, no Michigan Supreme Court case has held such a sentence unconstitutional. Accordingly, the dissent's argument turns solely on policy[20] and an overly broad reading and application of *Miller* and *Bullock*.

Affirmed in part, vacated in part, and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

O'CONNELL, J., concurred with MURRAY, J.

GLEICHER, P.J. (*concurring in part and dissenting in part*). I concur with the result reached by the majority regarding defendant Dakotah Eliason's challenges to

---

[19] The proportionality analysis is made at the time the defendant is sentenced, so what the parole board may do some years down the road, or even what rules and regulations are in place when a defendant is later considered for parole, is merely speculative at the time of sentencing.

[20] And, as we emphasized earlier, those policy decisions are constitutionally left to debate within the halls of the Legislature. *Curry v Meijer, Inc*, 286 Mich App 586, 599; 780 NW2d 603 (2009).

his first-degree-murder conviction. I write separately to respectfully express my belief that the Michigan Constitution forbids the trial court from resentencing Dakotah to imprisonment for life without the possibility of parole. Furthermore, because Michigan's parole guidelines do not take into account Dakotah's youth at the time he committed the crime, I believe that both the United States and Michigan Constitutions mandate that the trial court consider sentencing Dakotah to a term of years that affords him a realistic opportunity for release.

### I. THE EIGHTH AMENDMENT, PROPORTIONALITY, AND JUVENILE OFFENDERS

The Eighth Amendment of the United States Constitution embodies the basic precept that punishment for crime should be proportioned to both the offender and the offense. *Miller v Alabama*, 567 US ___; 132 S Ct 2455, 2463; 183 L Ed 2d 407 (2012). "The concept of proportionality is central to the Eighth Amendment." *Graham v Florida*, 560 US 48; 130 S Ct 2011, 2021; 176 L Ed 2d 825 (2010). Applying proportionality principles, the Supreme Court held in *Miller* that a mandatory sentence of life imprisonment without the possibility of parole violates the Eighth Amendment's prohibition of "cruel and unusual punishments" when imposed on an offender who had not reached the age of 18 at the time of his crime. *Miller*, 567 US at ___; 132 S Ct at 2469.

*Miller*'s holding flows from two precedential strands of Eighth Amendment jurisprudence: "categorical bans on sentencing practices based on mismatches between the culpability of a class of offenders and the severity of a penalty," *Miller*, 567 US at ___; 132 S Ct at 2463, and the requirement "that sentencing authorities consider the characteristics of a defendant and the details of his

offense before sentencing him to death" *id.* at ___; 132 S Ct at 2463-2464. "[T]he confluence of these two lines of precedent," the Supreme Court explained, "leads to the conclusion that mandatory life-without-parole sentences for juveniles violate the Eighth Amendment." *Id.* at ___; 132 S Ct at 2464.

The "categorical ban" authorities cited by the Supreme Court, *Roper v Simmons*, 543 US 551; 125 S Ct 1183; 161 L Ed 2d 1 (2005), and *Graham*, 560 US 48, "establish that children are constitutionally different from adults for the purposes of sentencing." *Miller*, 567 US at ___; 132 S Ct at 2464. Recklessness, impulsivity, and thoughtlessly engaging in risk-taking behaviors are but three unpleasant hallmarks of adolescent behavior. These characteristics of youth render children "less culpable than adults[.]" *Graham*, 560 US at ___; 130 S Ct at 2028 (quotation marks and citation omitted). Accordingly, a convicted defendant's age figures prominently in the Eighth Amendment's proportionality analysis. *Miller*, 567 US at ___; 132 S Ct at 2465-2466.

Because "youth matters" in determining whether lifetime incarceration without the possibility of parole is warranted, "criminal procedure laws that fail to take defendants' youthfulness into account at all would be flawed." *Id.* at ___; 132 S Ct at 2465-2466 (quotation marks and citation omitted). Thus, mandatory penalty provisions contravene the fundamental constitutional principle "that imposition of a State's most severe penalties on juvenile offenders cannot proceed as though they were not children." *Id.* at ___; 132 S Ct at 2466. Likening life-without-parole sentences to the death penalty, the Supreme Court reasoned that juveniles convicted of homicide must be sentenced individually and in a manner that recognizes "the mitigating

qualities of youth." *Id.* at ___; 132 S Ct at 2467 (quotation marks and citation omitted). The Supreme Court elaborated:

> [M]andatory penalties, by their nature, preclude a sentencer from taking account of an offender's age and the wealth of characteristics and circumstances attendant to it. Under these schemes, every juvenile will receive the same sentence as every other—the 17-year-old and the 14-year-old, the shooter and the accomplice, the child from a stable household and the child from a chaotic and abusive one. And still worse, each juvenile . . . will receive the same sentence as the vast majority of adults committing similar homicide offense—but really, as *Graham* noted, a *greater* sentence than those adults will serve. [*Id.* at ___; 132 S Ct at 2467-2468.]

Juveniles convicted of even the most serious offenses may redeem themselves in prison and thereby demonstrate an ability to rejoin society as productive members. For this reason, the Eighth Amendment requires that states provide " 'some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation.' " *Id.* at ___; 132 S Ct at 2469, quoting *Graham*, 560 US at ___; 130 S Ct at 2030. And although the Supreme Court refused to "foreclose a sentencer's ability" to impose on a juvenile a punishment of life without parole, the Court emphasized that "appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon." *Miller*, 567 US at ___; 132 S Ct at 2469.

The majority recognizes that *Miller* sets forth a new constitutional rule governing the process of sentencing juveniles convicted of first-degree murder in Michigan. Citing this Court's opinion in *People v Carp*, 298 Mich App 472; 828 NW2d 685 (2012), the majority holds that Dakotah is entitled to resentencing following a hearing after which the trial court must impose a sentence of

either life without the possibility of parole, or life imprisonment with the possibility of parole. According to dicta contained in *Carp* and adopted by the majority, *Miller* "does not . . . imply that a sentencing court has unfettered discretion when sentencing a juvenile. Rather, the focus is on the discretion of the sentencer to determine whether to impose the harshest penalty of life without the possibility of parole on a juvenile convicted of a homicide offense." *Id.* at 525.

In accordance with *Carp*, the majority circumscribes Dakotah's sentence alternatives to life imprisonment without parole or life imprisonment with parole. The majority predicates this rule on "the Michigan Legislature's judgment that a life sentence is the appropriate punishment for a juvenile who is lawfully convicted of first-degree murder." Contrary to *Carp* and the majority, *Miller* mandates that a sentencing court retain discretion to fashion an individualized sentence that takes into account an offender's youth and "distinctive (and transitory) mental traits and environmental vulnerabilities," and also affords young offenders a "meaningful opportunity to obtain release." *Miller*, 567 US at ___, ___; 132 S Ct at 2465, 2469 (quotation marks and citation omitted). The sentencing calculus crafted by *Carp* violates *Miller* because it eliminates individualized sentencing and (as *Carp* concedes) it forecloses any meaningful opportunity for a reformed juvenile to obtain his or her freedom.

Furthermore, while professing fidelity to legislative sentencing judgments, the majority (and *Carp*) fail to identify any statutory provision permitting a trial court to sentence a defendant convicted of first-degree murder to life imprisonment with the possibility of parole. Our Legislature has defined only one sentence for first-degree murder, and that sentence simply does not contemplate life with parole.

The majority insists that *Miller* requires that when resentencing juveniles, judges must apply the legislative "policy choice" most consistent with life without parole. I find nothing in *Miller* even remotely consistent with this view. To the contrary, *Miller* holds that proportionality principles must guide juvenile sentencing, and that laws that disregard the characteristics of youth are flawed. *Miller*, 567 US at ___; 132 S Ct at 2465-2466. Moreover, the majority's newly created life-sentence option is no more tethered to Michigan's legislative sentencing scheme than a term-of-years sentence. Absent any legislatively approved sentence for first-degree murder other than life without parole, the real question is whether affording a sentencing court the ability to impose a term-of-years sentence is required to fulfill *Miller*'s mandate. In my view, only this option permits an individualized sentence and offers a juvenile " 'some *meaningful* opportunity to obtain release.' " *Miller*, 567 US at ___; 132 S Ct at 2469 (citation omitted; emphasis added).

Furthermore, article 1, § 16 of the Michigan Constitution precludes sentencing Dakotah to life imprisonment. Michigan's constitutional prohibition of cruel or unusual punishment incorporates a proportionality analysis emphasizing evolving sentencing standards "enlightened by a humane justice," and focusing on rehabilitation rather than retribution. *People v Lorentzen*, 387 Mich 167, 178, 179-181; 194 NW2d 827 (1972) (quotation marks and citation omitted). Measured against this framework, a life sentence with or without the possibility of parole exceeds constitutional bounds.

## II. THE EIGHTH AMENDMENT, JUVENILE OFFENDERS, AND MICHIGAN'S SENTENCING SCHEME

In *Carp*, this Court elected to "provide guidance" to courts that would in the future sentence juveniles

convicted of first-degree murder, despite that the sole issue presented was whether *Miller* applied retroactively. *Carp*, 298 Mich App at 523. In dicta adopted uncritically by the majority, *Carp* limited sentencing courts' range of options to life imprisonment with parole, or life without parole. *Id.* at 527. *Carp* based this commandment on its own determination that "[i]t would . . . be inconsistent to sentence juveniles who commit murder to a sentence that is not proportional to the severity of the crime." *Id.* at 528.

This new rule is incorrect for two reasons. First, it ignores the United States Supreme Court's admonition in *Miller*, *Graham*, and *Roper* that a youthful offender's sentence must be proportioned *to the offender* as well as the offense. While an automatic life sentence may be proportionate to the crime of murder, a life sentence may not be imposed on a juvenile absent meaningful consideration of whether such punishment fits the *juvenile criminal*. *Carp*'s prescription—life with or without parole—nullifies the "foundational principle[] that imposition of a State's most severe penalties on juvenile offenders cannot proceed as though they were not children."[1] *Miller*, 567 US at ___; 132 S Ct at 2466.

Pursuant to *Miller*'s core proportionality principles, an offender's age possesses special relevance that necessarily factors prominently in a sentencing calculation.

---

[1] *Carp*'s conclusion that juveniles who commit murder deserve a life sentence because only a life sentence is proportionate to that crime disregards that just as all juveniles are not alike, neither are all murders. Kuntrell Jackson, one of the *Miller* defendants, had not fired the bullet that killed the victim and did not intend her death. He was convicted solely as an aider and abettor. *Miller*, 567 US at ___; 132 S Ct at 2468. These mitigating circumstances "go to Jackson's culpability for the offense." *Id.* Thus, sentencing a juvenile convicted of first-degree murder to life imprisonment without parole may sometimes qualify as inconsistent with substantial justice. Ultimately, that question is for a sentencing court to decide, not the Michigan Court of Appeals.

*Id.* at ___; 132 S Ct 2469. *Miller* instructs that because "youth matters in determining the appropriateness of a lifetime of incarceration without the possibility of parole," sentencing courts must consider "the background and mental and emotional development" of each individual youthful offender before passing sentence. *Id.* at ___, ___; 132 S Ct at 2465, 2467 (quotation marks and citation omitted). In other words, *Miller* compels a sentencing court to tailor punishment to an offender's *personal* responsibility and *singular* moral guilt. To comply with *Miller*, a judge must bear in mind that children under age 18 are "categorically less culpable," *Roper*, 543 US at 567 (quotation marks and citation omitted), and more amenable to rehabilitation than adults who commit the same crimes. A sentencing scheme that forecloses sentencing proportionate to a child's culpability violates *Graham*, *Roper*, and *Miller*.

For this reason, *Carp*'s circumscription of sentence options to either of two life terms cannot be reconciled with *Miller*'s central teaching: children are constitutionally unique. Judges sentencing children must consider the mitigating effects of youth and the specific circumstances of their crimes. These factors may counsel strongly against a life term, either with or without the possibility of parole. A sentencing rubric that fails to permit proportional and individualized mitigation does not pass constitutional muster.

In light of the "diminish[ed] . . . penological justifications for imposing the harshest sentences on juvenile offenders, even when they commit terrible crimes," *Miller*, 567 US at ___; 132 S Ct at 2465, different sentencing principles apply. Despite that Michigan law demands that an adult murderer serve a mandatory life sentence, *Miller* obligates sentencing courts to exercise meaningful discretion when sentencing a child who

committed that same crime. Exercising discretion involves thoughtfully considering "the wealth of characteristics and circumstances attendant to" a defendant's youth, *id.* at ___; 132 S Ct at 2467, which in turn means that a court must be permitted to reject that a child deserves to serve a life term. In my view, the exercise of discretion contemplated in *Miller* is simply inconsistent with a rule allowing only for life imprisonment with or without parole. The "two-sizes-fit-all" approach embraced by *Carp* offends the Eighth Amendment because it forecloses proportionality.[2]

I respectfully take issue with *Carp* for a second reason. In *Carp*, this Court acknowledged that a parolable life sentence likely results in lifetime imprisonment. *Carp*, 298 Mich App at 533-535.[3] This reality compels the conclusion that a sentence of life with parole is just as final as one that denies the possibility of parole at the outset. Although *Carp* urges that the Parole Board provide "a meaningful determination and review when parole eligibility arises," *id.* at 536, *Miller* instructs that removing youth from the balance *at the time of sentencing* contravenes the Eighth Amendment by prohibiting a judge "from assessing whether the

---

[2] Like the California Court of Appeal, I believe that a "presumptive penalty" of life imprisonment cannot be "constitutionally square[d]" with *Miller*. *People v Siackasorn*, 211 Cal App 4th 909, 912; 149 Cal Rptr 3d 918 (2012) lv gtd 154 Cal Rptr 3d 73 (2013). In *Siackasorn*, the court held that a sentencing judge has "equal discretion to impose" either life without parole or the 25-years-to-life penalty permitted by a California statute. *Id.* Michigan lacks a complementary statutory provision. But that hardly means that a sentencing court has "unfettered" discretion to sentence a juvenile convicted of first-degree murder. A sentence of life or a term of years is well known in this state. See MCL 750.317; *People v Moore*, 432 Mich 311; 439 NW2d 684 (1989). A disproportionately light sentence is as objectionable as a disproportionately onerous one.

[3] See also *Alexander v Birkett*, 228 Fed Appx 534 (CA 6, 2007).

law's harshest term of imprisonment proportionately punishes a juvenile offender." *Miller*, 567 US at ___; 132 S Ct at 2466.

Postponing proportionality analysis until parole eligibility is simply inconsistent with *Miller*. This is particularly true in Michigan, as the statutory and administrative standards governing our parole board's decision-making bear no resemblance to the most relevant mitigating factors identified in *Miller*: a juvenile's diminished moral culpability, the "wealth of characteristics and circumstances attendant to" an offender's youth at the time the crime was committed, and the harshness of a life sentence imposed on, for example, a 14-year-old child. *Miller*, 567 US at ___; 132 S Ct at 2467. Instead, Michigan's parole system focuses on "the prisoner's mental and social attitude" *at the time parole is considered*. MCL 791.233(1)(a). Although the parole guidelines examine the severity of the crime, they omit regard for a youthful offender's unique characteristics. See *In re Parole of Elias*, 294 Mich App 507, 512-517; 811 NW2d 541 (2011). Uncertain, unpredictable, and unlikely parole does not substitute for factoring in on the "front end" a juvenile's lessened culpability. *Miller* does not contemplate that a parole board may substitute for a sentencing judge.

Because the alternative sentencing options set forth in *Carp* are materially indistinguishable and discretionary in name only, they do not satisfy *Miller*. In practice, they are but two sides of the same life-imprisonment coin. Confining a sentencing court's ability to commit a juvenile to life without parole or to life with but the barest possible prospect of parole defies *Miller*'s mandate that when passing sentence, judges must "take into account how children are different, and how those differences counsel against irrevocably sentencing them

to a lifetime in prison." *Miller*, 567 US at ___; 132 S Ct at 2469. Accordingly, implementing *Miller* entails more than mechanically applying adult sentencing practices to child offenders.

*Carp* declares that *Miller* "does not require Michigan or other states with similar mandatory sentencing schemes to abrogate or abandon a hierarchical methodology of sentencing for those convicted of first-degree murder or to necessitate a term of years sentence consistent with a lesser offense, such as second-degree murder." *Carp*, 298 Mich App at 527. I respectfully submit that this statement reflects a misunderstanding of *Miller*. *Miller* does not "abrogate or abandon" any state's sentencing methodology. It simply requires that every state adjust that methodology in a manner that recognizes that "youth matters," allowing judges to implement that recognition by tailoring a sentence to fit the offender as well as the offense. Because a parolable life sentence in Michigan actually amounts to the imposition of a life-without-parole sentence, *Carp* has simply written mitigation out of the equation. Regardless whether a "term of years" sentence would correspond with a conviction of second-degree murder, it must remain an option for a sentencing court.

### III. THE MICHIGAN CONSTITUTION

Const 1963, art 1, § 16 prohibits the infliction of cruel or unusual punishment. In *People v Bullock*, 440 Mich 15, 30; 485 NW2d 866 (1992), our Supreme Court held that this provision should be interpreted more expansively than the United States Supreme Court interprets the Eighth Amendment. Three "compelling reasons" guided the *Bullock* Court's decision to construe the provisions differently. First, Michigan's Constitution bars "cruel *or* unusual" punishments, while

the federal constitution addresses "cruel *and* unusual" punishments. *Id.* This textual variance "does not appear to be accidental or inadvertent." *Id.* at 30. The *Bullock* Court restated *Lorentzen*'s observation that "this difference in phraseology . . . might well lead to different results with regard to allegedly disproportionate prison terms." *Id.* at 31. Quoting *Lorentzen*, 387 Mich at 172, the Court explained that " '[t]he prohibition of punishment that is unusual but not necessarily cruel carries an implication that unusually excessive imprisonment is included in that prohibition.' " *Bullock*, 440 Mich at 31.

Next, *Bullock* drew on "historical factors" suggesting that the framers of Michigan's Constitution understood the meaning of the clause differently than did the United States Supreme Court. In contrast with the United States Supreme Court, by 1963 the Michigan Supreme Court had determined that the cruel and unusual punishment ban "include[d] a prohibition on grossly disproportionate sentences." *Id.* at 32. "Longstanding Michigan precedent" guided the *Bullock* Court's conclusion that the Michigan Supreme Court has historically interpreted the operative words through the prism of proportionality. *Id.* at 33-34 (formatting altered).

After establishing the interpretive independence of the Michigan Supreme Court concerning our Constitution's "cruel or unusual punishment" provision, the Court struck down as unconstitutionally disproportionate a mandatory sentence of life without possibility of parole for conviction of knowing possession of 650 grams or more of cocaine. *Id.* at 40. Notably, the United States Supreme Court had rebuffed an Eighth Amendment challenge to precisely the same sentence less than one year earlier in *Harmelin v Michigan*, 501 US 957;

111 S Ct 2680; 115 L Ed 2d 836 (1991). The Michigan Supreme Court specifically embraced Justice Byron White's dissenting opinion in *Harmelin*, ruling that "[t]o be constitutionally proportionate, punishment must be tailored to a defendant's personal responsibility and moral guilt." *Bullock*, 440 Mich at 39, quoting *Harmelin*, 501 US at 1023 (White, J., dissenting).

*Bullock* thereby invalidated the life-without-parole sentences for the two defendants in that case, as well as all others "currently incarcerated under the same penalty, and for committing the same offense[.]" *Bullock*, 440 Mich at 42. The "most appropriate remedy" for the disproportionate life sentences imposed on those offenders, the Court concluded, was to "ameliorate the no-parole feature of the penalty" and to require that "such defendants [receive] the parole consideration otherwise available upon completion of ten calendar years of the sentence" in accordance with MCL 791.234(4), which is now MCL 791.234(7)(a). *Bullock*, 440 Mich at 42.

In *Bullock*, 440 Mich at 34, the Court acknowledged that its proportionality analysis derived from *Lorentzen*. The 23-year-old defendant in *Lorentzen* was convicted of "the unlicensed sale, dispensation or otherwise giving away of any quantity of marijuana," and was sentenced to the mandatory minimum for that offense: 20 years' imprisonment. *Lorentzen*, 387 Mich at 170-171. The defendant lived with his parents, worked at General Motors, and had no other criminal convictions. *Id.* at 170. The Supreme Court held the defendant's sentence unconstitutional under the Michigan Constitution, explaining that "[a] compulsory prison sentence of 20 years for a nonviolent crime imposed without consideration for defendant's individual personality and history is so excessive that it 'shocks the conscience.' " *Id.* at 181.

*Lorentzen* fashioned a three-factor test for evaluating proportionality under the Michigan Constitution. First, a court must weigh the gravity of the offense against the severity of the punishment. *Id.* at 176. Next, a court applies the "decency test," which compares the sentences for other similar and different crimes, in Michigan and in other states. *Id.* at 179. Finally, a court looks to "rehabilitative considerations in criminal punishment," recognizing that Michigan's sentencing scheme is designed " 'to reform criminals and to convert bad citizens into good citizens, and thus protect society[.]' " *Id.* at 179-180, quoting *People v Cook*, 147 Mich 127, 132; 110 NW 514 (1907). Specifically,

> "[t]his test looks to a consideration of the modern policy factors underlying criminal penalties—rehabilitation of the individual offender, society's need to deter similar proscribed behavior in others, and the need to prevent the individual offender from causing further injury to society." [*Lorentzen*, 387 Mich at 180, quoting *In re Southard*, 298 Mich 75, 82; 298 NW 457 (1941).]

This final criterion, the *Bullock* Court explained, is "rooted in Michigan's legal traditions[.]" *Bullock*, 440 Mich at 34.

*Bullock* and *Lorentzen* stand for the proposition that Const 1963, art 1, § 16 prohibits both an unusually excessive period of imprisonment when compared with the seriousness of the crime, and a punishment that qualifies as disproportionately cruel considering the characteristics of the offender. In my view, sentencing a juvenile to life imprisonment with or without parole effectively trumps *Lorentzen*'s "decency test" and casts aside the mainstay rehabilitative ideals encompassed within article 1, § 16.[4]

---

[4] The majority implies a preference that the current Supreme Court overrule *Bullock* and *Lorentzen*. I find this preference quite ironic in light

IV. MICHIGAN'S CONSTITUTION AND JUVENILE HOMICIDE
OFFENDERS

The Michigan Supreme Court explicitly recognized in *Lorentzen* and *Bullock* that "moral guilt" and "the moral sense of the people" inform proportionality. *Bullock*, 440 Mich at 39, 35 n 18 (quotation marks and citations omitted). This acknowledgment corresponds with the United States Supreme Court's portrayal of the evolving nature of Eighth Amendment jurisprudence: "The standard of extreme cruelty is not merely descriptive, but necessarily embodies a moral judgment. The standard itself remains the same, but its applicability must change as the basic mores of society change." *Furman v Georgia*, 408 US 238, 382; 92 S Ct 2726; 33 L Ed 2d 346 (1972) (Burger, C.J., dissenting). *Roper, Graham*, and *Miller* underscore that the need to sentence children differently than adults has achieved acceptance as a moral imperative.

In *Lorentzen* and *Bullock*, as in *Graham* and *Miller*, the Courts exercised "independent judgment requir-[ing] consideration of the culpability of the offenders at issue in light of their crimes and characteristics, along with the severity of the punishment in question." *Graham*, 560 US at ___; 130 S Ct at 2026. In these cases, the United States Supreme Court struck down sentences deemed excessive in light of contemporary norms and discordant with the penological goals sentencing should fulfill. All four cases agreed that as a matter of constitutional law, mandatory punishments insufficiently corresponding with a defendant's indi-

of the majority's paean to precedent from *Allegheny Gen Hosp v NLRB*, 608 F2d 965, 969-970 (CA 3, 1979). I remind the majority that despite the Legislature's power to fashion sentences for crimes, the people of this state limited that authority by ratifying article 1, § 16 of Michigan's Constitution. To hold otherwise denigrates our Constitution and disregards the judiciary's role in constitutional enforcement.

vidual blameworthiness and the legitimate purposes of punishment do not pass muster. In this regard, as *Bullock* explicitly recognized, Michigan's proportionality jurisprudence foreshadowed the development of federal Eighth Amendment law. While the United States Supreme Court in *Miller* declined to categorically ban lifetime imprisonment for juveniles who have committed murder, I believe that pursuant to *Bullock* and *Lorentzen*, Const 1963, art 1, § 16 commands this result in Michigan.

Mandatory life imprisonment constitutes the single harshest sentence that can be imposed by a Michigan judge. Lifetime incarceration of a juvenile, imposed without regard to his or her individual background and emotional development, is morally insupportable for the host of reasons discussed in *Roper, Graham,* and *Miller.* "From a moral standpoint it would be misguided to equate the failings of a minor with those of an adult, for a greater possibility exists that a minor's character deficiencies will be reformed." *Roper,* 543 US at 570. To protect the community, it may be rational to deprive an adult murderer of any hope of freedom. The morality of such a severe sentence rests on the need to incapacitate a dangerous person, to exact retribution, and to deter others from committing the same heinous crime. Those ethical considerations ring hollow when applied to a youth such as Dakotah.

Dakotah is not a hardened criminal; when he killed his grandfather, he was an extremely troubled young man. As quoted in Dakota's supplemental brief supporting his motion for a new trial the forensic report addressing his criminal responsibility elucidated that Dakotah

> experienced a significant amount of loss in a relatively short period of time, namely the deaths of his cousin, dog

and friend to suicide, not to mention the back drop of the very significant and repeated loss of his mother via abandonment. These losses would be difficult for any adolescent to cope with, but Mr. Eliason seems to have lacked the supports and guidance many others receive from their parents/family and even friends. As a result he appears to have been left to his own devices and he appears to have lacked the capabilities to gradually come to terms with these losses. Rather, they were forces which overwhelmed him.

Additionally, defense counsel elicited testimony from the forensic examiner at the posttrial evidentiary hearing that the trauma Dakotah experienced triggered him to view the world "like he was watching a movie" so that "everything appear[ed] to be fantasy," thereby explaining Dakotah's actions.

Given Dakotah's emotional limitations at age 14, officially pronouncing that he is and forever will be irretrievably depraved flies in the face of common sense. Dakotah's maturational shortcomings mirror those of the youthful offenders described in *Roper*, *Graham*, and *Miller*. These defendants lacked the ability to regulate negative and destructive behavior—a defining feature of adolescence. It is simply impossible to predict whether Dakotah will someday develop the ability to grasp the full horror of his crime and to employ that knowledge in his emotional growth. "Maturity can lead to that considered reflection which is the foundation for remorse, renewal, and rehabilitation." *Graham*, 560 US at ___; 130 S Ct at 2032. Because youthful offenders may grow and change, "irrevocable judgment[s] about" their characters offend our Constitution's proportionality guarantee. *Id.* at ___; 130 S Ct at 2030.

Furthermore, mandatory lifetime incarceration of a teenager serves no valid penological purpose. "A sentence lacking any legitimate penological justification is

by its nature disproportionate to the offense." *Id*. at
\_\_\_; 130 S Ct at 2028. In *Lorentzen*, our Supreme Court
described three primary "policy factors underlying
criminal penalties": rehabilitation, deterrence, and pre-
vention. *Lorentzen*, 387 Mich at 180.[5] A mandatory
lifetime sentence "does not even purport to serve a
rehabilitative function." *Harmelin*, 501 US at 1028
(Stevens, J., dissenting). As *Graham* explained, juvenile
offenders are generally not susceptible to being de-
terred based on their propensity for making "impetuous
and ill-considered" decisions. *Graham*, 560 US at \_\_\_;
130 S Ct at 2028-2029 (quotation marks and citation
omitted). And while permanently incarcerating a juve-
nile likely eliminates the possibility that he or she will
commit another homicide, this is an extraordinarily
drastic measure given the very real possibility that age
would accomplish the same result. "*Roper* and *Graham*
emphasized that the distinctive attributes of youth
diminish the penological justifications for imposing the
harshest sentences on juvenile offenders, even when
they commit terrible crimes." *Miller*, 567 US at \_\_\_; 132
S Ct at 2465.

*Lorentzen* and *Bullock* support that mandatory life-
time prison sentences may not be imposed on homicide
offenders under age 18. By forbidding cruel punishment
regardless of its commonality, Michigan's Constitution
prohibits imposing a severe, mandatory sentence that
ignores both an offender's circumstances and lacks
applicability to the goals of punishment recognized in
this state. The evolving standards of decency elegantly
articulated in *Graham* and *Miller* represent "the moral
sense of the people" that imprisoning children for life is

---

[5] Retribution constitutes a fourth. The arguments supporting purely
retributive justice lose their power when applied to offenders who lack
the ability to regulate their behavior. See *Roper*, 543 US at 571.

a disproportionate penalty regardless of the crime. Furthermore, lifetime imprisonment of a child serves no rational purpose. Accordingly, I would hold that lifetime imprisonment of a juvenile offender violates Const 1963, art 1, § 16.

## V. RESENTENCING DAKOTAH

When the trial court sentenced Dakotah to life imprisonment without possibility of parole, it rejected his counsel's argument that this sentence constituted a cruel or unusual punishment. "Other than his juvenile status," the trial court opined, "there's really nothing about Mr. Eliason that makes him less culpable than any other person who has murdered another human being in cold blood." The trial court spoke these words before the Supreme Court issued its decision in *Miller*. Accordingly, the majority correctly recognizes that Dakotah must be resentenced.

Despite that the trial court lacked the benefit of *Miller*'s reasoning when it imposed sentence, I believe that the trial court has clearly and unequivocally expressed its opposition to any sentence less than mandatory life. I quote the court's sentencing rationale at length here because I believe it demonstrates that the trial court has made up its mind about Dakotah, regardless of *Miller*:

> In this case the defendant was examined by two mental health profession[al]s, including one selected by the defense. There's been no showing that the defendant suffered from any mental health or intellectual deficiency. To the contrary, all the evidence has been that Mr. Eliason is an intelligent and articulate young man. There was some testimony that Mr. Eliason was going through some personal problems. But other than the recent suicide of a close friend, which the court concedes is a major event in the life of any young person, any

one, but otherwise he was attempting to work through problems common to many 14 year old boys.

His parents separated when he was young. He didn't get to spend enough time with his mother or his half-brother. He had some difficulty in meeting his father's expectations. His pet died. These are problems that certainly are -- I'm not saying they're insubstanial, but they're certainly common to many 14 year old boys.

\* \* \*

There are factors which in the court's view might make, and do make the defendant more culpable than perhaps other defendants who have committed first degree murder. He enjoyed a close relationship with his victim, and enjoyed -- and had the benefit of his grandfather's frequent hospitality. Mr. Eliason was welcomed almost every weekend into the victim's home and treated [it] as a weekend refuge from his own -- life with his own family.

There has been no mitigating explanation provided for the murder. And the reason for the killing apparently remains a mystery to this day.

Mr. Eliason's testimony showed he spent several hours quietly contemplating whether or not to kill his grandfather. And then after that period of contemplation was over, shot his grandfather in the head while his grandfather slept. When the murder weapon was found the hammer on the revolver was cocked, and there were five live rounds in the chamber.

And the court, along with the jury, listened carefully to the recorded statements given by Mr. Eliason at the scene, later at the law enforcement complex, and remarks that he made to Deputy Casto while he was seated in the back of Deputy Casto's patrol car. Mr. Eliason showed a remarkable lack of emotion or remorse after the shooting and talked about the situation in a very calm and matter of fact way.[6]

---

[6] Lack of demonstrated remorse is yet another feature of a child's immaturity. For a full discussion of this subject, see Duncan, *"So young*

There -- the court has been presented with nothing to convince [sic] that a life without parole sentence is particularly cruel and unusual when imposed upon Mr. Eliason in particular. *And as I said, certain aspects of the case show that such a sentence is particularly appropriate when applied to Mr. Eliason.* So the court does not find that a life without parole sentence for Mr. Eliason, convicted of first degree murder is in violation of the constitution as cruel and unusual. [Emphasis added.]

It is unreasonable to expect that the trial court will simply discard these sincerely held views in light of *Miller*. The trial court's words make abundantly clear its rejection that the mitigating factors of youth described in *Miller*, *Graham*, and *Roper* should be applied to Dakotah. To preserve the appearance of fairness and justice, a different judge should resentence Dakotah. See *People v Evans*, 156 Mich App 68, 71-72; 401 NW2d 312 (1986).

---

*and so untender": Remorseless children and the expectations of the law*, 102 Colum L Rev 1469 (2002). Judge Richard Posner has also written, quite persuasively, that an apparent absence of remorse ("a mitigating factor") does not automatically translate for sentencing purposes to the presence of an aggravating factor. *United States v Mikos*, 539 F3d 706, 721-724 (CA 7, 2008) (Posner, J., dissenting).