# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

　　　　　Plaintiff-Appellee,

v

KENYA ALI HYATT,

　　　　　Defendant-Appellant.

FOR PUBLICATION
July 21, 2016

No.  325741
Genesee Circuit Court
LC No.  13-032654-FC

Before:  SHAPIRO, P.J., and MARKEY, METER, BECKERING, STEPHENS, M.J. KELLY, and RIORDAN, JJ.

BECKERING, J., (*concurring*).

　　　　The task for this conflict panel is limited; we are asked to decide whether a judge or a jury is to determine whether a juvenile should be sentenced to life without parole under MCL 769.25.  This question presumes that the imposition of a life-without-parole sentence is constitutionally permissible in Michigan for juvenile offenders who commit the worst homicide offenses.  I write a separate concurrence to voice my concern that this underlying premise is a faulty one.  Although the issue was raised by defendant, it is unpreserved, scantily briefed, and better left for another day.  Were we to address it, I would conclude that a sentence of life without parole for a juvenile offender constitutes cruel or unusual punishment in violation of the Michigan Constitution.[1]  Given the United States Supreme Court's conclusions regarding the inherent difficulties in reliably assessing whether a still-developing juvenile is irreparably corrupt, the case-by-case individual sentencing scheme set forth in MCL 769.25 is far too imprecise an exercise to pass muster under the Michigan Constitution.  Instead, after a minimum term of years such as that set forth in MCL 769.25(9), the determination should be left to the

---

[1] In *People v Carp*, 496 Mich 440; 852 NW2d 801 (2014), vacated *Davis v Michigan*, __ US __; 136 S Ct 1356; 194 L Ed 2d 339 (2016), our Supreme Court concluded that a juvenile life-without-parole sentence was not cruel or unusual under the Michigan Constitution.  However, in light of the fact that the case was vacated, and because I believe that *Carp*'s analysis did not address the problems associated with the imprecise and speculative nature of assessing irreparable corruption when deciding whether to impose a life-without-parole sentence on an individual who committed an offense while a minor, I voice my concerns in this concurring opinion, if only to ask our Supreme Court to consider the issue in the future.

parole board, which has the benefit of a more fully developed individual and a number of years in which the individual can prove himself or herself worthy of parole.

In *Miller v Alabama*, 576 US __; 132 S Ct 2455, 2469; 183 L Ed 2d 407 (2012), the Supreme Court declined to expressly weigh in on the issue of whether the Eighth Amendment required a categorical bar on life without parole for juvenile offenders. However, when one sifts through *Miller*'s various warnings about: (1) how juveniles are categorically less deserving of the harshest possible punishment that can be imposed upon them; (2) how the penological justifications for imposing the harshest punishment dissipate when the characteristics of juvenile offenders are considered; (3) the inherent difficulty in making determinations about a juvenile's character at the time of sentencing; and (4) how rarely such a sentence will be proportionate; one could conceivably determine that a life-without-parole sentence for a juvenile offender is, at best, constitutionally suspect, according to *Miller*. At the very least, to the extent that *Miller* left open the window for juvenile life-without-parole sentences for the rare or uncommon juvenile, see *id*. at 2469, that window should be understood to be a very narrow one.

Nonetheless, whether life without parole for juveniles should be categorically barred by the Eighth Amendment is not my concern in the present case. Rather, I question whether life without parole for juveniles should be categorically barred under the Michigan Constitution, which prohibits cruel *or* unusual punishment.[2] Const 1963, art 1, § 16. Our Courts have generally found that the prohibition contained in Const 1963, art 1, § 16 affords greater protection than the Eighth Amendment and that it requires a closer inquiry of the punishment at issue. *People v Benton*, 294 Mich App 191, 204; 817 NW2d 599 (2011); *People v Nunez*, 242 Mich App 610, 618 n 2; 619 NW2d 550 (2000).

My concerns about the imprecise nature of determining whether a juvenile offender— who, it must be remembered, is not immune from punishment because of his youth—stem from our increasing scientific knowledge regarding the human brain and our recognition that a juvenile is different from an adult because of his or her diminished culpability and greater capacity for reform, and from the idea that the characteristics of youth make a determination of irreparable corruption or permanent incorrigibility exceedingly difficult. As to the first point, United States Supreme Court precedent concerning juveniles makes clear that juveniles often lack the same degree of culpability that adult offenders possess. Juveniles lack maturity and are often more prone to reckless behavior and risk-taking. See *Miller v Alabama*, 576 US __; 132 S Ct 2455, 2464; 183 L Ed 2d 407 (2012). And, as noted by the Court in *Miller*, juveniles are subject to influences—such as a home environment from which the juvenile cannot normally extricate himself or herself—in a way not typically experienced by adults. *Id*. Finally, juvenile offenders, because of their various stages of cognitive development, often have a greater capacity for reform than adult offenders. *Id*. Stated differently, juveniles inherently have a certain degree of malleability due to their immaturity that adults lack. As a result it would be "misguided"

---

[2] I am not the first to opine that lifetime imprisonment of a juvenile offender violates the Michigan Constitution. See *People v Eliason*, 300 Mich App 293, 332-336; 833 NW2d 357 (2013) (Gleicher, J., concurring in part and dissenting in part).

morally "to equate the failings of a minor with those of an adult, for a greater possibility exists that a minor's character deficiencies will be reformed." *Roper v Simmons*, 543 US 551, 570; 125 S Ct 1183; 161 L Ed 2d 1 (2005). Thus, juveniles should be treated differently from adults for purposes of sentencing, particularly in regard to the imposition of the most serious punishment that can be imposed on juvenile offenders: life without parole. Life without parole for juveniles is a punishment, it must be noted, that caused the Court in *Graham* and *Miller* to break rank from the longstanding idea that "death is different" when it comes to making comparisons between different types of punishment, and inspired the Court to liken life-without-parole sentences for juveniles to the death penalty for adult offenders. See *Miller*, 132 US at 2463; *Graham v Florida*, 560 US 48, 69-71; 130 S Ct 2011; 176 L Ed 2d 825 (2010).

As to my second and greater concern, the difficult nature of making individual determinations about juvenile offenders can be gleaned from a comprehensive reading of *Roper*, *Graham*, and *Miller*. Starting in *Roper*, 543 US at 569, the Supreme Court recognized that the characteristics of youth "demonstrate that juvenile offenders *cannot with reliability be classified among the worst offenders*." (Emphasis added). This proclamation was based, in large part, on studies related to the death penalty and juveniles which led the Court in *Roper* to remark that "[i]t is difficult even for expert psychologists to differentiate between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption." *Roper*, 543 US at 573. As the point is made in the majority opinion in the instant case, if this determination is difficult for a trained psychologist, how much more difficult is it for a sentencing judge or an appellate court on review?

The idea that the characteristics of youth make difficult, if not impossible, accurate determinations about a juvenile's capacity for change continued in *Graham* and *Miller*. In *Graham*, 560 US at 68, the Court noted pertinent research explaining that "parts of the brain involved in behavior control continue to mature through late adolescence." *Id*. (citations omitted). This continued development and pliable nature of juveniles necessarily makes it difficult to reliably classify a juvenile as being the rare juvenile who is incapable of change. See *id*. The Court in *Graham*, 560 US at 77-78, felt so strongly about the difficulty of distinguishing "the few incorrigible juvenile offenders from the many that have the capacity for change" that it rejected—in the case of nonhomicide juvenile offenders—a case-specific sentencing scheme similar to that implemented in MCL 769.25,[3] and decided that because a determination about the juvenile's character was so difficult to make, it would instead impose a categorical ban on life without parole in nonhomicide cases.

---

[3] While it could be argued that the Supreme Court in *Miller* gave its blessing to such a scheme for juveniles who commit homicide offenders, it should be noted that the question of whether there should be a categorical ban on life without parole for juvenile homicide offenders was not before the *Miller* Court, and the Court expressly declined to consider the issue. *Miller*, 132 S Ct at 2469.

The concern noted in *Roper* and *Graham* still remains: it is exceedingly difficult, given the qualities of youth, to make a reliable determination regarding whether a juvenile is truly incorrigible and incapable of change. This concern led the Court in *Miller*, 132 S Ct at 2467, to remark that proportionate life-without-parole sentences, to the extent they could even be imposed, would be "uncommon" and "rare," because "youth is more than a chronological fact," and "its signature qualities are all transient." *Miller*, 132 S Ct at 2467. Furthermore, the studies on which *Roper*, *Graham*, and *Miller* relied have continued validity and applicability, leading the American Psychology Association, which filed an amicus brief in *Miller*, to posit that " '[t]he positive predicative power of juvenile psychotherapy assessments . . . remains poor.' " *State v Sweet*, __ NW2d __ (Iowa, 2016) (Docket No. 14-0455), slip op at 35 (citation omitted).

Given the difficulty of predicting when a juvenile is truly incapable of change and thus deserving of a life-without-parole sentence, the admitted lack of reliability in a case-by-case sentencing approach, and the significance of the sentencing decision, I believe that the imposition of life-without-parole sentences on juveniles is far too speculative and that it is cruel or unusual under the Michigan Constitution. In this regard, I find particularly compelling *Roper*'s warning that the type of classification required by MCL 769.25 cannot be done with reliability by a trained psychologist, let alone a sentencing court. I also find compelling that the Supreme Court in *Graham*, 560 US at 77-78, expressly rejected a case-by-case approach, albeit in the context of non-homicide offenses, for determining when life without parole would be appropriate for juveniles. The fact that the sentence at issue in the present case involves a homicide offense does not mean that the determination to be made with regard to the juvenile offender's character, i.e., his immaturity, depravity, vulnerability to outside influence, culpability, or capacity for change, is markedly less difficult. Nor, for that matter, does the fact that the conviction involves a homicide offense necessarily take account of "special difficulties encountered by counsel in juvenile representation," that were noted by *Graham*—such as the fact that juveniles generally mistrust adults, including defense counsel, have limited understanding of the criminal justice system, are less generally less capable of weighing the long-term consequences of plea offers, and are likely less capable of assisting with their own defense—that further illustrate the problems inherent in a case-by-case approach such as the one at issue in this case. See *Graham*, 560 US at 78-79. In short, the fact that the instant case involves a homicide offense does nothing to dispel the concerns that led the Court in *Graham* to reject the type of case-by-case sentencing approach that is currently in effect under MCL 769.25. On this point, the *Miller* Court explained that although *Graham*'s ban on life without parole applied in nonhomicide cases:

> none of what [*Graham*] said about children—about their distinctive (and transitory mental traits and environmental vulnerabilities—is crime specific. Those features are evident in the same way, and to the same degree when . . . a botched robbery turns into a killing. So *Graham*'s reasoning implicates *any life-*

*without-parole sentence* imposed on a juvenile, even as its categorical bar relates only to nonhomicide offenses. [*Miller*, 132 S Ct at 2465 (emphasis added).[4]]

Thus, simply arguing that the instant case is different from *Graham* because it involves a homicide offense ignores that which is most pertinent in determining whether the punishment is cruel or unusual for juveniles: that being, that the characteristics of youth and its attendant circumstances make juveniles constitutionally different for purposes of sentencing, and it is extremely difficult to determine, with any degree of reliability, which juveniles are truly deserving of life without parole. Such a sentence necessarily concludes at the outset that the individual who committed a crime when he or she was a minor will be corrupt at the age of 20, 30, 40, 50, 60, 70, and at every age for that matter until they die.

I believe that the concerns noted by the Court in *Miller*, *Graham*, and *Roper* are applicable in the case at hand. These cases essentially teach us that a sentencing court is, to a large degree, guessing, based on information that is widely recognized as unreliable given the malleability of a juvenile's still-developing brain, whether the juvenile is capable of reform. This is not to fault the sentencing judge tasked with trying to decide whether to impose life without parole. I have no doubt that sentencing courts exercise the utmost care and professionalism in determining whether this particular punishment, or any punishment, is appropriate and proportionate. The constitutional concern I see is not one of a lack of diligence or professionalism, however, but is one involving the very nature of the inquiry that is to be made in deciding whether to impose life without parole on juvenile offenders. A sentencing judge being tasked with determining whether to impose a life-without-parole sentence is faced with an arduous task. Simply put, as the United States Supreme Court has repeatedly warned, this task requires an inquiry that is based on poor predictors and one that cannot be made with a sufficient degree of reliability, based on a juvenile's still-developing sense of maturity and, in general greater capacity for reform. And this task, it must be remembered, carries with it the exceedingly high risk of imposing a disproportionate sentence that violates the juvenile's constitutional rights. As noted in *Montgomery v Louisiana*, __ US __; 136 S Ct 718, 734; 193 L Ed 2d 599 (2016), "[e]ven if a court considers the child's age before sentencing him or her to a lifetime in prison, that sentence still violates the Eighth Amendment for a child whose crime reflects unfortunate yet transient immaturity." *Montgomery*, 136 S Ct at 734.

Thus, I note my concerns that the speculative nature inherent in imposing a life-without-parole sentence on juvenile homicide offenders renders the punishment cruel or unusual under the Michigan Constitution. If the imposition of the harshest possible penalty available under the law cannot be done with any degree of reliability given the offender being a minor about whom the court must predict his or her entire future, how can the sentence not be rendered either cruel due to guesswork or unusually unfair? By their very chronological status as minors, juvenile

---

[4] Again, while the Court in *Miller* was cognizant of these very concerns, it declined to expressly weigh in on the issue of whether a juvenile life-without-parole sentence was cruel *and* unusual under the United States Constitution, but it nevertheless went out of its way to emphasize how truly rare this type of sentence would be constitutionally proportionate.

offenders spend more time in prison for a life-without-parole offense than any adult, yet they were minors when they committed their offense, and as such, were in a categorically less culpable class of offenders according to our United States Supreme Court. How could such a speculative, roll-of-the-dice approach to meting out the most serious punishment on a group of offenders who are categorically less culpable not be cruel or unusual? One need only examine his or her own character, judgment, maturity level, impetuosity, and susceptibility to influence at the ages of 14,[5] 15, 16, and 17 years of age and contrast these same traits as they exist at the age of 40 on up, as that marks the age range a juvenile offender will be after completing only the bare minimum 25 years for a minimum sentence under MCL 769.25(9). While juvenile offenders are certainly deserving of punishment for their offenses, the task of accurately pegging the rare individual who is truly irreparably corrupt is simply too imprecise and speculative to pass constitutional muster under Michigan's constitution.

Turning to the instant case, the *Miller* hearing that took place for defendant Hyatt serves as a prime illustration of the lack of reliability involved in making a determination about a juvenile's still-forming character. The psychologist who testified in this case had a Ph.D. in educational and clinical psychology and had been a practicing psychologist for approximately 40 years. Yet, when pressed on cross-examination whether she thought defendant Hyatt was capable of change, she admitted "I have no way of predicting whether he is going to be able to change his course. . . . I cannot say with certainty that he, that he's totally unredeemable." I highlight this not as an indictment on the doctor's qualifications or abilities, but to point out that the doctor admitted the same concerns noted above: even a trained psychologist has essentially no way of knowing what would become of defendant Hyatt's character—or that of any other juvenile, for that matter—in the future or whether he has the capacity to change at some point in his lifetime.

The solution to this complex problem is relatively simple: let the parole board do its job. Let the parole board, which will have the benefit of full cognitive development through adulthood, as well as years of institutional records and behavior, make the decision. Rather than asking a sentencing court to essentially make its best guess based on information that is admittedly not adequate for the task at hand, why not allow the parole board, which has the benefit of time, incarceration records, and further cognitive development by the juvenile, make the decision? However, this is not to suggest, in any fashion, that a juvenile should be *guaranteed* parole. Rather, the only entitlement is that the individual, who entered prison while still a child, should have the chance to show that he or she is capable of reform, and has indeed demonstrated the requisite level of reform to merit consideration for parole. As stated in *Graham*, 560 US at 75, juveniles should be given "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." If a juvenile offender is truly the rare individual who is irreparably corrupt, that condition will surely manifest itself and be verified during the lengthy term of incarceration the individual will have served before becoming parole-eligible. Likewise, determining whether the individual, now with the benefit of further

---

[5] Or even younger than 14, for that matter, as Michigan law allows for juveniles younger than 14 years of age to be tried as adults. See MCL 712A.2d; MCL 712A.4.

cognitive development and maturation, is capable of reform and change will be far less speculative at this point in time. Allowing the parole board to make this determination gives a juvenile a chance at parole after his or her character is more fully formed, rather than at a time when that character is, by all accounts, "a work in progress." *Sweet*, __ NW2d __; slip op at 55.

I am not alone in adhering to this view. Recently, the Iowa Supreme Court, which has written rather extensively on a variety of juvenile life-without-parole issues post-*Miller*, concluded that the Iowa Constitution, which mirrors the United States Constitution and bars cruel *and* unusual punishment, forbids a case-by-case approach and categorically bars the imposition of life-without-parole sentences for juveniles. In this regard, the Iowa Court concluded "that the enterprise of identifying which juvenile offenders are irretrievable at the time of trial *is simply too speculative and likely impossible given what we now know about the timeline of brain development and related prospects for self-regulation and rehabilitation.*" *Sweet*, __ NW2d __; slip op at 50 (emphasis added). As noted by the Iowa Supreme Court, studies on the timeline and phenomenon of juvenile brain development explain that "smart adolescents sometimes do really stupid things." *Id.* at 51-52, citing Laurence Steinberg, *Age of Opportunity: Lessons from the New Science of Adolescence* 69 (2014).[6] And, remarked the Iowa Court, the *Miller* factors are themselves "fraught with risks," of misapplication, because some factors could necessarily be viewed as weighing in favor of life without parole and against it at the same time.[7] All of this leads back to the original point: it is extremely problematic to require

---

[6] It is not until the third and final phase of brain development, which takes place "into the early twenties," when individuals " 'get better at controlling their impulses, thinking about the long-term consequences of their decisions, and resisting peer pressure.' " *Id.*, quoting Sternberg, at 71.

[7] As an example, the Court asked:

> . . . what significance should a sentencing court attach to a juvenile offender's stable home environment? Would the fact that the adolescent offender failed to benefit from a comparatively positive home environment suggest he or she is irreparable and an unlikely candidate for rehabilitation? Or conversely, would the offender's experience with a stable home environment suggest that his or her character and personality have not been irreparably damaged and prospects for rehabilitation are therefore greater?

> * * *

> A similar quandary faces courts sentencing juvenile offenders who have experienced horrendous abuse and neglect or otherwise have been deprived of a stable home environment. Should the offenders' resulting profound character deficits and deep-seated wounds count against the prospects for rehabilitation and in favor of life-without-the-possibility-of-parole sentences under the *Miller* framework? Or should sentencing courts view the deprivation of a stable home environment as a contraindication for life without the possibility of parole

a sentencing court to make "speculative up-front decisions on juvenile offenders' prospects for rehabilitation because they lack adequate predictive information supporting such a decision." *Id*. at 54. "[T]he risk of error" in determining whether a life-without-parole sentence is proportionate "is unacceptably high" at the time of sentencing; this high risk of error caused the Iowa Supreme Court to impose a categorical ban on life-without-parole sentences for juveniles. *Id*. at 51. According to the Iowa Supreme Court, a sentencing court:

> cannot apply the *Miller* factors in any principled way to identify with assurance those very few adolescent offenders that might later be proven to be irretrievably depraved. In short, we are asking the sentencer to do the impossible, namely, to determine whether the offender is "irretrievably corrupt" at a time when even trained professionals with years of clinical experience would not attempt to make such a determination. [*Id*.]

Furthermore, although the speculative nature of imposing life-without-parole sentences on juveniles is enough to raise serious concerns about the constitutionality of such sentences under the Michigan Constitution, it should be noted, as it regards the practice of permitting life-without-parole sentences for juveniles, Michigan appears to be in danger of standing on the wrong side of history. In the wake of *Miller*, a growing number of states have decided to prohibit, or in some cases, not seek, life-without-parole sentences for juveniles. See, e.g., Mills, et al, *Juvenile Life Without Parole in Law & Practice: Chronicling the Rapid Change Underway*, 65 Am U L Rev 535, 552, 560 (2016); The Sentencing Project, Juvenile Life Without Parole: An Overview, available at http://www.sentencingproject.org/publications/juvenile-life-without-parole/ (accessed June 29, 2016); Equal Justice Initiative, *Philadelphia District Attorney Declares Life-Without-Parole Sentences Inappropriate for Juveniles*, http://www.eji.org/philadelphia-da-says-life-without-parole-inappropriate-for-juveniles (accessed June 28, 2016); Equal Justice Initiative, *Utah Joins Growing Number of States That Have Abolished Juvenile Life Without Parole Sentences*, http://www.eji.org/node/1243 (accessed June 28, 2016); News Center 1, *South Dakota Bans Life-Without-Parole Sentences for Youth*, http://www.newscenter1.tv/story/31497823/south-dakota-bans-life-without-parole-sentences-for-youth (accessed June 15, 2016); The Campaign for the Fair Sentencing of Youth, *States that Ban Life Without Parole for Children*, <http://fairsentencingofyouth.org/reports-and-research/sentenceeliminated/> (accessed July 6, 2016).[8] In evaluating the cruel and/or unusual nature of a punishment, it must be noted that it is not necessarily the number of states that

---

> because only time will tell whether maturation will come with age and treatment in a structured environment? [*Id*. at 51-53.]

[8] There is also an effort currently underway in the United States District Court for the Eastern District of Michigan to ban life-without-parole sentences for juvenile offenders. See The Detroit News, *Federal Judge Stops Juvenile Lifer Sentencing Process*, http://www.detroitnews.com/story/news/local/michigan/2016/07/07/michigan-juvenile-resentencing/86810456/ (accessed July 8, 2016). See also *Hill v Snyder*, unpublished decision of the Eastern District of Michigan (Docket No. 14568), issued January 30, 2013, vacated and remanded on other grounds, 821 F3d 763 (2016).

authorize a particular penalty that is of importance, but "*the consistency of the direction of change*" is to be examined as well. *Atkins*, 536 US 304, 315; 122 S Ct 2242; 153 L Ed 2d 335 (2002) (emphasis added). The number of states eliminating life-without-parole sentences in light of *Miller* leaves one fearing that Michigan, one of a handful of states responsible for the most juvenile life-without-parole sentences, see *Juvenile Life Without Parole in Practice*, 65 Am U L Rev at 571-572, is on the wrong side of the recent direction of change. This is particularly so in light of reluctance in states such as Pennsylvania to seek juvenile life-without-parole sentences, given that Pennsylvania was, along with Michigan, one of only a few states responsible for a majority of juvenile life-without-parole sentences. See *Juvenile Life Without Parole in Practice*, 65 Am U L Rev at 571-572. This recent trend illustrates that the island on which Michigan sits with regard to this particular sentencing practice is becoming increasingly lonelier.

Finally, even if a categorical ban is off the table in light of *Carp*, I would be remiss not to note, in light of the same concerns raised above, what I view as significant holes in MCL 769.25's implementation of the *Miller* decision. Even if the Michigan Constitution does not compel a categorical ban on the imposition of juvenile life-without-parole sentences, the concerns inherent with sentencing juveniles to life-without-parole sentences do not suddenly diminish. It is not as if the unreliable and unreasonably difficult task of determining which juvenile offenders are truly incorrigible and incapable of change vanishes by rejecting a categorical ban on life without parole for juveniles. Those concerns must be addressed, or our courts risk the arbitrary and capricious imposition of juvenile life-without-parole sentences.

The legislative response to *Miller* in MCL 769.25 does not go far enough in addressing these concerns. The Supreme Court's decision in *Miller* announced the destination that is required by the Eighth Amendment—individualized sentencing that limits the imposition of life-without-parole sentences to only those rare individuals who are irreparably corrupt—but did little to address how to arrive at that destination. The Court even recognized as much in *Montgomery v Louisiana*, __ US __; 136 S Ct 718, 734-735; 193 L Ed 2d 599 (2016), where the Court stated that *Miller* was largely a substantive rule, and the responsibility for implementing procedures to comply with *Miller* was left to the states. *Miller*, it could be said, set forth the *minimum* that must be done. The response in Michigan, MCL 769.25, offers little in the way of procedural requirements beyond the bare minimum that *Miller* articulated. The statute requires a hearing at which the trial court is to consider the "*Miller* factors," but otherwise is silent, save for announcing that the trial court can hold a hearing and consider evidence, and that any victims shall be given the right to appear or make a statement. See MCL 769.25(6)-(7). Essentially, the statute requires a sentencing court to "do *Miller*" and nothing more.

In order to implement *Miller* in a way that affords meaning and substance to the decision, we must provide sentencing courts with more direction, guidance, and information to guide the sentencing process. While the ultimate determination as to what procedures should be employed is not before the Court in this conflict case, I offer a few, brief suggestions. Drawing on comparisons to death penalty cases first made in *Graham* and repeated in *Miller*, the employment of a defense team which includes two attorneys, a mitigation specialist, and an investigator, as is done in death penalty cases, may go some distance towards alleviating the difficulties inherent in determining whether a juvenile is irreparably corrupt. See Drinan, *Juvenile Sentencing Post-Miller: Preventive & Corrective Measures*, 2015 Wis L Rev 203, 209-210 (2015). See also The Campaign for the Fair Sentencing of Youth, *Trial Defense Guidelines:*

*Representing a Child Client Facing a Possible Life Sentence*, < http://fairsentencingofyouth.org/wp-content/uploads/2015/03/Trial-Defense-Guidelines-Representing-a-Child-Client-Facing-a-Possible-Life-Sentence.pdf> (accessed July 6, 2016).[9] Further, provisions could be made for a sentencing court to hear testimony from a variety of expert witnesses in a way that shines further light on some of the subjects that mark the determination to be made with so much uncertainty. These include, to name a few, subjects such as juvenile brain development, immaturity, intellectual capacity, susceptibility to influences such as peer pressure and family pressure, the effect of the juvenile's background, if any, and the capacity for reform. See *Trial Defense Guidelines*, p 20. As noted by the Iowa Supreme Court in *Sweet*, __ NW2d __; slip op at 46, when it briefly considered how to attempt to accurately sentence juveniles to life-without-parole sentences in a way that could pass constitutional muster under the Eighth Amendment: "the process for making the determination of which offenders are most culpable would be resource intensive, require expert testimony, and would not be a matter left to the unguided discretion of the sentencer." The process described by MCL 769.25 is not resource intensive, makes no mention of expert testimony, and places little restrictions, if any, on the discretion of the sentencer. Those defects, which the majority opinion goes some distance toward remedying, should, in my opinion, be addressed.

/s/ Jane M. Beckering
/s/ Douglas B. Shapiro

---

[9] These guidelines are modeled after the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases.