# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

BERNARDO CARLOS REEVES,

Defendant-Appellant.

UNPUBLISHED
December 6, 2018

No. 338438
Wayne Circuit Court
LC No. 15-002309-01-FC

Before: SHAPIRO, P.J., and SERVITTO and GADOLA, JJ.

PER CURIAM.

Defendant appeals as of right his bench trial convictions of second degree murder, MCL 750.317; felon in possession of a firearm, MCL 750.224f; and felony firearm, MCL 750.227b. The trial court sentenced defendant to concurrent terms of 28 to 50 years' imprisonment on the second degree murder conviction and 1 to 5 years' on the felon in possession conviction, to be served consecutive to 2 years' imprisonment on the felony firearm conviction. We affirm.

In the early morning hours of January 15, 2015, Gregory Allen attended defendant's birthday party at a home owned by defendant or his girlfriend in Detroit, MI. At some point during the course of the night, Allen and defendant got into a disagreement and Allen was killed at the home. Allen's body was then dumped into a nearby street and the home was burned.

On appeal, defendant first contends that he was denied his constitutional right to confront witnesses against him due to the trial court's denial of his motion to exclude the testimony of witness April Sandell at trial. We disagree.

We review de novo questions of constitutional law, including the right to confront witnesses, but review the trial court's findings of fact underlying the application of constitutional law for clear error. *People v Rose*, 289 Mich App 499, 505; 808 NW2d 301 (2010). We review a trial court's decision whether to admit evidence for an abuse of discretion. *People v Katt*, 468 Mich 272, 278; 662 NW2d 12 (2003).

April Sandell is a former friend of defendant's son, Bernardo Reeves, Jr. ("Reeves"). Sandell testified at trial that in January of 2015, she and her boyfriend (a close friend of Reeves) saw Reeves on the street near defendant's home carrying a gas can. They picked Reeves up and dropped him off at defendant's home, drove around for approximately 10-15 minutes, and then picked him back up. According to Sandell, a short time after they picked Reeves up, she noticed

-1-

that a home was on fire. Sandell testified that Reeves stayed that night at her house and the next day, he told her and her boyfriend that he had been at a party at defendant's home and one of defendant's friends had shown up and gotten into an altercation with Allen. Reeves told Sandell and her boyfriend that he had left the home for a brief time and when he returned, everyone was gone and Allen was lying dead at the entrance of the home. Sandell testified that Reeves said defendant had then called him and told him to get rid of the body, the house, and defendant's car and that defendant further stated to Reeves, "I don't know why he killed him. I don't know why he shot him. We were drinking and having a good time."

"In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." US Const, Am VI; see also Const 1963, Art 1 § 20. *People v Nunley*, 491 Mich 686, 697; 821 NW2d 642 (2012). This right is aimed at truth-seeking and promoting reliability in criminal trials. *Id*. The specific protections the Confrontation Clause provides apply only to statements used as substantive evidence. "In particular, one of the core protections of the Confrontation Clause concerns hearsay evidence that is 'testimonial' in nature"; thus, "out-of-court testimonial statements are inadmissible unless the declarant appears at trial or the defendant has had a previous opportunity to cross-examine the declarant." *Id*. at 697-698. Noting that there is no precise definition of what constitutes "testimonial" statements, the *Nunley* Court indicated that the Supreme Court has provided the following guidance:

> Various formulations of this core class of "testimonial" statements exist: "*ex parte* in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially," "extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions," "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial [.]" These formulations all share a common nucleus and then define the [Confrontation] Clause's coverage at various levels of abstraction around it. Regardless of the precise articulation, some statements qualify under any definition—for example, *ex parte* testimony at a preliminary hearing. [*Id*. at 698-699, quoting *Crawford v Washington*, 541 US 36, 51-52; 124 S Ct 1354; 158 L Ed 2d 177 (2004)]

Sandell's testimony concerned out-of-court statements made by her friend, Reeves, in a causal setting concerning what defendant had told him about the incident at defendant's home. Clearly, the statements made by defendant to Reeves were not testimonial in nature (i.e., made under circumstances essentially assumed or intended to take the place of in-court testimony). Sandell testified that she dropped Reeves off with a gas can in front of defendant's house and that when she picked him up several minutes later, "a house" was on fire. Reeves explained to her the next day *why* he had set the house on fire, explaining that defendant had told him that another man had killed Allen in the home and that he needed Reeves to get rid of the house. Sandell appears to have had no intention of revealing these statements to anyone until Reeves

-2-

purportedly provided testimony against her in an unrelated federal case. The circumstances under which the statements were made to Sandell do not indicate that they were made as a substitute for in-court testimony.[1]

In *People v Taylor*, 482 Mich 368; 759 NW2d 361 (2008), two men, Scarber and King, kidnapped a victim and drove him to a house owned by a female acquaintance. Scarber told the woman's brother, Ervin, what had happened and provided further details implicating himself King, and a third man. Ervin left the home but returned later after Scarber called and told him that King had shot the victim and the victim had bled to death. Ervin saw the dead body, and then went to the store to procure tools for the three men to bury the body. When King challenged the trial court's admission of Ervin's testimony concerning Scarber's statements to Ervin implicating King, our Supreme Court found no violation of the Confrontation Clause because the challenged statements were nontestimonial in nature. *Id*. at 374. This case is analogous because the challenged statements were out-of-court statements made to an acquaintance or friend and implicated the speaker. The trial court did not violate the Confrontation Clause in admitting Sandell's testimony.

The statements were also admissible under an exception to the general rule precluding the admission of hearsay at trial—MRE 804(B)(3). In *Taylor*, 482 Mich at 375, our Supreme Court found that the statements made by Scarber inculpating himself and King were admissible under MRE 804(B)(3), given that the declarant inculpated himself as well as King. The same holds true here. As with Scarber in the *Taylor* case, Reeves volunteered the information concerning defendant's house and the incidents of January 15, 2015, to his friends. In doing so, he clearly inculpated himself in a crime as well as defendant. This was against defendant's penal interest as well as Reeves and was therefore admissible under MRE 804(B)(3).

Defendant next asserts that the waiver of his *Miranda*[2] rights prior to his custodial interrogation was not voluntarily given due to his intoxication and limited mental capacity and that the trial court's denial of his motion to suppress statements given to police was erroneous and that the admission of his statements to police at trial also violated Due Process. We disagree.

We review de novo a trial court's determination that a waiver of *Miranda* rights was a knowing, intelligent, and voluntary waiver. *People v Henry (Aft Rem)*, 305 Mich App 127, 144; 854 NW2d 114 (2014). "However, we review a trial court's factual findings on a motion to suppress for clear error." *Id*. This Court reviews "preserved issues of constitutional error to determine whether they are harmless beyond a reasonable doubt." *Id*., quoting *People v Dendel (On Second Remand)*, 289 Mich App 445, 475; 797 NW2d 645 (2010).

In order to protect the right against self-incrimination under the Fifth Amendment of the United States Constitution, an accused must be given a series of warnings before being subjected

---

[1] Reeves did, however, invoke his 5th Amendment right at defendant's trial.

[2] *Miranda v Arizona*, 384 US 436, 444–445, 477–479; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

to a custodial interrogation. *People v Tanner*, 496 Mich 199, 207; 853 NW2d 653 (2014), citing *Miranda v Arizona*, 384 US 436, 444–445, 477–479; 86 S Ct 1602; 16 L Ed 2d 694 (1966). "If a suspect is not afforded *Miranda* warnings before custodial interrogation, no evidence obtained as a result of interrogation can be used against him." *Tanner*, 496 Mich at 207-208 (citation and internal quotation marks omitted). However, if a suspect has been afforded *Miranda* warnings and waives his *Miranda* rights, subsequent incriminating statements may be used against him. *Id*. at 209 (citation omitted).

"[T]he analysis of whether an accused properly waived his *Miranda* rights requires us to look at two considerations: "(1) whether the waiver was voluntary, and (2) whether the waiver was knowing and intelligent." *People v Eliason*, 300 Mich App 293, 304; 833 NW2d 357 (2013). Whether a waiver was voluntary "depends on the absence of police coercion; the defendant's waiver must be his or her own free and deliberate choice, rather than the product of intimidation." *Id*. (citation and internal quotation marks omitted). Whether a waiver is knowing and intelligent requires an inquiry into an accused's level of understanding, irrespective of police conduct. *People v Daoud*, 462 Mich 621, 636; 614 NW2d 152 (2000). To knowingly waive *Miranda* rights, an accused does not need to understand the consequences of choosing to waive or exercise the rights that the police have explained to him. *Id*. Rather, only a very basic understanding of those rights is all that is necessary. *People v Gipson*, 287 Mich App 261, 265; 787 NW2d 126 (2010). Intoxication from alcohol or other substances can affect the validity of a waiver, but is not dispositive. *Id*.

On January 15, 2015, at approximately 2:15 p.m., defendant was arrested and taken into custody. He was subject to a custodial interrogation at approximately 4:15 p.m. that day. Defendant does not contend that he was coerced in any way by the police to provide a statement or speak to them. Thus, the "voluntary" prong of his waiver is not at issue. With respect to whether defendant's waiver was "knowing and intelligent" defendant underwent evaluations concerning his mental competency to waive his *Miranda* rights and was afforded a hearing with respect to the same on March 4, 2016.

At the hearing, Dr. Deanna Yount, a psychologist at the Center for Forensic Psychiatry, evaluated defendant for competency to waive his *Miranda* rights on June 24, 2015, and found that defendant was, in fact, competent. Dr. Yount testified that during her interview with defendant, he was uncooperative, but when he chose to answer questions he was able to answer quite well.

Dr. Gerald Shiener, a privately employed psychiatrist, however, testified that he evaluated defendant on December 9, 2015, and found him incompetent. Dr. Shiener found defendant to have a cognitive impairment and limited ability to think in abstract ways or to understand precisely how the court system or its participants worked. Dr. Shiener testified that he felt, through his observations of defendant and his testing, that defendant was making good effort during the evaluation and that defendant would be unable to properly understand certain things involved in the criminal process.

The trial court found Dr. Yount to be more credible and found that defendant's cognitive abilities did not preclude his understanding of what he was signing, what the nature of those statements were, and that he had a right not to give statements. Because the determination of a

defendant's competency is within the discretion of the trial court, it was also within the trial court's discretion to determine which doctor's testimony or reports it found more reliable when determining defendant's competency. See *People v Newton*, 179 Mich App 484, 488; 446 NW2d 487 (1989). Notably, at the conclusion of the competency hearing, defense counsel noted that defendant had told him that an officer wrote down things in a report that defendant did not say and defendant wanted him to pursue it. The trial court stated that defendant had made that claim at the examiner's as well, which also led to its belief and conclusion that defendant was competent to waive his *Miranda* rights. The trial court did not abuse its discretion in its finding.

As to whether defendant was too intoxicated to be able to knowingly and intelligently waive his *Miranda* rights, Detroit police officer Jessica McDonald pulled defendant over in his Ford Mustang around 2:10 p.m. on January 15, 2015, for failing to signal and based on information from homicide that defendant may be a suspect in Allen's murder. Officer McDonald testified that she smelled alcohol on defendant and defendant told her that he had been drinking the night before at a birthday party. There was no testimony from Officer McDonald that defendant was walking or speaking in a manner that suggested that he was intoxicated and she did not issue defendant any violations for drinking and driving offenses. Also, just prior to defendant's being pulled over, police had been conducting surveillance on defendant's mother's house to see if defendant was there. Officers conducting surveillance testified to observing defendant move a white SUV out of the driveway, then get into and drive a Mustang away and to following the Mustang until Officer McDonald pulled defendant over. None of the officers testified that defendant was walking or driving in manner that suggested he was intoxicated.

In addition, Sergeant Todd Eby testified at trial that he had walked defendant from where he was being housed to his interview with police on January 15, 2015, and that his manner of walking and conversation gave no suggestion of intoxication. Sergeant Eby testified that he asked defendant about alcohol use and defendant indicated that he had been drunk the night before and was now hungover. Sergeant Eby testified that when he began interviewing defendant, he was comfortable that defendant was not under the influence based upon his observations of and conversations with defendant.

The trial court also reviewed a video recording of defendant's January 15, 2015, interview with police to determine, among other things, if defendant was intoxicated. The trial court found no evidence that defendant was intoxicated during his interview with police. This Court, too, has reviewed the recorded interview and finds no evidence that defendant was intoxicated during this interview. Defendant walked around at times during the interview without stumbling or wobbling, clearly and concisely read his *Miranda* rights aloud at the beginning of the interview, and clearly answered questions posed to him and provided detailed narratives of the events that occurred prior to and at his birthday party with no slurring of speech or other indication that he was intoxicated. In short, there was no testimony or evidence that defendant was intoxicated at his interview on January 15, 2015.

Finally, a defendant need only have the most basic understanding of *Miranda* to competently waive those rights–not the repercussions or consequences of doing so. *Gipson*, 287 Mich App at 265. By all accounts, defendant could read, had a GED, was self-employed on some basis, had prior contact with the judicial system and read and initialed a Miranda waiver

form before engaging with police on January 15, 2015. There is no evidence that defendant lacked a basic understanding of his *Miranda* rights. The trial court did not abuse its discretion in finding defendant competent to waive his *Miranda* rights and thus did not err in denying defendant's motion to suppress statements given to police or violate defendant's Due Process rights in admitting the statements at trial.

Defendant additionally argues that the trial court abused its discretion in finding him competent to stand trial. We find no abuse of discretion.

MCL 330.2020 provides, in relevant part:

> (1) A defendant to a criminal charge shall be presumed competent to stand trial. He shall be determined incompetent to stand trial only if he is incapable because of his mental condition of understanding the nature and object of the proceedings against him or of assisting in his defense in a rational manner. The court shall determine the capacity of a defendant to assist in his defense by his ability to perform the tasks reasonably necessary for him to perform in the preparation of his defense and during his trial.

When the issue of competency arises, and, "[u]pon a showing that the defendant may be incompetent to stand trial, the court shall order the defendant to undergo an examination by personnel of either the center for forensic psychiatry or other facility officially certified by the department of mental health to perform examinations relating to the issue of incompetence to stand trial." MCL 330.2026. After the examination and the preparation of a written report containing an opinion as to whether the examining facility finds the defendant competent to stand trial (see MCL 330.2028), the trial court is to hold a hearing to determine the issue of defendant's competence to stand trial (see MCL 330.2030).

At the same hearing to determine defendant's competency to waive his *Miranda* rights, the trial court was presented with evidence to determine defendant's competency to stand trial. Dr. Richard Rickman, a forensic psychologist at the Center for Forensic Psychiatry testified that he evaluated defendant on February 8, 2016, for competency to stand trial. Dr. Rickman testified that defendant was uncooperative during his evaluation, giving very brief answers to Dr. Rickman's questions. Dr. Rickman testified that defendant acted like he didn't know anything and acted as though he could not answer questions because they were too difficult. Dr. Rickman testified that defendant's presentation was inconsistent with what Dr. Rickman knows to be true of someone who has the sort of intellectual deficit claimed by defendant and was also inconsistent with what Dr. Rickman understood was defendant's prior presentation at two other evaluations at the forensic center. Dr. Rickman testified that he performed a number of tests to directly assess malingering (the intentional faking of symptoms) or feigning psychological problems and that defendant failed those tests at a significant level, indicating that he was intentionally trying to appear as though he had a mental deficiency. Dr. Rickman ultimately found defendant to be competent to stand trial.

Dr. Gerald Shiener testified that he evaluated defendant on December 9, 2015. Dr. Shiener testified that defendant did not understand the mechanism that a judge would use in making a decision on the case and did not understand the role of a jury. Dr. Shiener further

testified that defendant did not understand the role of a defense attorney, stating that the role was simply to listen to him and determine what happened. Dr. Shiener testified that defendant recognized that he could take a plea bargain or not and that the outcome of a trial was he could go to jail or go home and also understood that witnesses get on the stand and answer questions. According to Dr. Shiener, however, defendant could not be brought to understand certain things because he has impairment in his ability to do so. Dr. Shiener opined that defendant's impairments are not consistent with being able to maintain that degree of understanding necessary to assist counsel and that he was therefore not competent to stand trial.

The trial court found the evaluations of the forensic center doctor a little more persuasive on the issue and more detailed. It thus found defendant competent to stand trial. It did not abuse its discretion in doing so.

First, when two experts submit differing opinions concerning a defendant's competency, it is up to the judge to determine which evidence to give more weight and credit to. See, e.g., *People v Liddell*, 63 Mich App 491, 494; 234 NW2d 669 (1975).

Second, from the record provided, it is clear that defendant was fully able to understand the nature and object of the proceedings against him and of assisting in his defense in a rational manner. MCL 330.2020. At the trial court's ruling on defendant's competency, on June 3, 2016, defense counsel stated that "my client also wants me to file a motion regarding police misconduct" indicating that defendant told him an officer wrote down things that defendant did not say. During later hearings defense counsel stated "My client has asked me to remind the Court that what you heard about the neighbor—he just brought it to my attention the content of what you said—was what the officers were saying— to my client not that, in fact, that's what the neighbor testified to at the exam," and "Well, you Honor, there was an issue that my client was very strongly concerned about that resulted in his request that I filed this motion to dismiss this case due to a fabrication of evidence by Sergeant Eby . . . . My client denies that it was his signature on that, but even more importantly he denies that some of the content of that statement was something that he actually said." Defense counsel also advised the court that defendant had asked him about the possibility of a bench trial.

Additionally, defendant was able to articulate his understanding of a waiver trial on the record before the trial court, and later made statements on the record concerning his ability to pay for discovery and questioning whether discovery had been withheld from him. Defendant was also quite articulate and specific during allocution at his sentencing. From the record, it is clear that defendant participated in his defense, directing counsel when there was a basis to file motions, when the evidence against him was incorrect, and even bringing up the idea of a bench trial. Defendant was also able to properly and accurately address issues before the trial court. Defendant was able to articulate and convey his understanding of the legal process and his rights. The trial court thus did not abuse its discretion in finding defendant competent to stand trial.

Defendant next assets that he was denied a fair trial by the admission of hearsay evidence from witness Felicia Whitted. We review preserved issues of alleged evidentiary error, such as this one, for an abuse of discretion. *People v Roscoe*, 303 Mich App 633, 639; 846 NW2d 402 (2014). "A preserved error in the admission of evidence does not warrant reversal unless after an examination of the entire cause, it shall affirmatively appear that it is more probable than not that

the error was outcome determinative." *Id*., quoting *People v Burns*, 494 Mich 104, 110; 832 NW2d 738 (2013).

MRE 402 provides that evidence that is relevant is generally admissible. MRE 401 defines "relevant evidence" as that "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 802 prohibits the admission of hearsay (a statement, other than one made the declarant while testifying at trial or hearing offered to prove the truth of the matter asserted (MRE 801(c)) except as otherwise provided under the rules of evidence.

Defendant sought to preclude the admission of a statement by Allen's girlfriend, Felicia Whitted, that she heard Allen yell during an accidental phone call he placed to her while she was driving to the party at defendant's house, "I'll kill you and your son" before the call hung up. Contrary to defendant's argument otherwise, the statement was not offered to prove the truth of the matter asserted. The statement was not offered to prove that Allen did or was actually going to "kill you and your son," assuming the two could mean defendant and Reeves. Instead, the statement was offered to establish that things were contentious at defendant's house and the contention involved Allen and defendant.

Moreover, defendant was tried in a bench trial, and a judge is presumed to know the law, including the difference between admissible and inadmissible evidence. *People v Wofford*, 196 Mich App 275, 282; 492 NW2d 747 (1992). The trial court did not abuse its discretion in admitting Whitted's statement.

Defendant next asserts that the prosecutor engaged in several acts of misconduct which deprived him of a fair trial. He further claims that counsel was ineffective for failing to object to these instances of prosecutorial misconduct. Because the claimed incidents of prosecutorial misconduct were not preserved by contemporaneous objections, appellate review is for outcome-determinative, plain error. *People v Unger*, 278 Mich App 210, 235; 749 NW2d 272 (2008). Under this standard, reversal is warranted only when plain error resulted in the conviction of an actually innocent defendant or seriously affected the fairness, integrity, or public reputation of judicial proceedings. *Id*.

The test for prosecutorial misconduct is whether a defendant was denied a fair and impartial trial. *People v Dobek*, 274 Mich App 58, 63; 732 NW2d 546 (2007). Issues of prosecutorial misconduct are decided on a case-by-case basis, and the reviewing court must evaluate a prosecutor's remarks in context. *People v Abraham*, 256 Mich App 265, 272–273; 662 NW2d 836 (2003). Prosecutors are typically accorded great latitude regarding their arguments and are free to argue the evidence and all reasonable inferences as may be related to their theory of the case. *Dobek*, 274 Mich App at 66. Prosecutors are also not confined to using the blandest possible terms. *Id*.

Defendant first takes issue with the prosecutor's use of the term "victim" to refer to Allen throughout the trial. "Victim" is defined as "[a] person harmed by a crime, tort, or other wrong." *Black's Law Dictionary* (9th ed). In this case, there is no dispute that Allen was murdered. He was thus a "victim." In this context, the prosecutor's use of the word "victim" during trial does not imply that defendant necessarily killed Allen; it simply recognizes that Allen was harmed by

a crime. Further, defendant was tried in a bench trial[3], and a judge is presumed to know the law, which would include legal terms and their definitions. See *People v Lanzo Constr Co*, 272 Mich App 470, 484; 726 NW2d 746 (2006). Consequently, the trial court would have known not to assume, simply by the prosecutor's use of the term "victim" that defendant was guilty of the charged crimes.

Defendant next takes issue with several statements made by the prosecutor during her closing argument, claiming that the prosecutor argued facts not in evidence. Again, because the trial judge, presiding over a bench trial, is presumed to know the law, see *id.*, the trial court here is presumed to have known that the prosecutor's remarks during closing argument were not evidence. The danger of any unfair prejudice from the prosecutor's statements during closing argument is therefore minimal in light of it being a bench trial, even if the statements were improper.

Briefly addressing the challenged statements, defendant first challenges the prosecutor's statement, during her closing that "[W]hen you look at the testimony of Felicia Whitted . . . and shortly thereafter Nardo, Jr., coming out being very angry and making a statement about getting a gun." While defendant argues that Whitted did not make this specific statement, Whitted testified that she did not recall telling police about Reeves "going to get a gun" but if that was in her written statement, that is what she told the officer. The prosecutor thus did not argue a fact not in evidence.

Defendant also challenges the prosecutor's statement made while relating defendant's versions of events that he provides to the police, that in one version provided by defendant, "[T]he most unbelievable thing about the defendant's story is that they would kill—these unknown men would kill [Allen] in front of him and then they would actually leave the defendant alive to tell about it. So the defendant then creates this story about why they left him alive, and eventually what he says is they left me alive because it was my birthday . . . ." During his police interview, when asked why the men who defendant alleged shot and killed Allen did not kill him too, defendant did, in fact, state that the men told him that the matter did not have anything to do with him and it was his birthday.

Finally, during rebuttal, the prosecutor stated:

> The medical examiner indicated that the – as it relates to the wounds on the body that it could have been made by two separate guns. Now, counsel says, well, we don't really have any evidence of that. Well, he's arguing [against] the defendant's own statement because the defendant said in his statement that both guns were fired, the AK-47 and the nine millimeter, so we know conclusively that if you take defendant's statement that two guns were fired in the house that night.

---

[3] It is noted that defendant, in his Standard 4 brief, claims that the incidents of prosecutorial misconduct misled the jury and prejudiced his right to a fair trial, which is a meritless claim since this was a bench trial.

During his police interview, defendant stated that Allen fired his nine millimeter handgun at the house, in the air on the night of his birthday. Defendant also stated that he saw one of the four unidentified men wrestle with Allen for the nine mm handgun that Allen had on his person, one of the four grab the Ak-47 that was in his home and shoot Allen twice, and that one of the men hit him in the mouth with the nine mm gun. Defendant further stated that he heard additional shots while he was covering his head on the floor and lying next to Allen. While the prosecutor stated that defendant said that two guns were fired in the house that night, he did say that two guns were fired at the home that night and that additional shots (that he did not see) were fired at Allen.

Defendant has not shown that there was any prosecutorial misconduct, that any alleged misconduct was outcome-determinative or that he was denied a fair trial on the basis of prosecutorial misconduct. *Unger*, 278 Mich App at 235. He has also not shown that counsel was ineffective for failing to object to these alleged instances of prosecutorial misconduct, since counsel is not ineffective for failing to raise meritless objections. *People v Putman*, 309 Mich App 240, 245; 870 NW2d 593 (2015).

Defendant next claims that there was insufficient evidence to support his convictions. We review de novo a challenge to the sufficiency of the evidence in a bench trial. *Lanzo Const Co*, 272 Mich App at 473. When determining if there exists sufficient evidence of guilt to sustain a conviction, we must consider the evidence in a light most favorable to the prosecution and determine whether a rational trier of fact could have concluded that all the elements of the offense were proven beyond a reasonable doubt. *People v Wolfe*, 440 Mich 508, 513–514; 489 NW2d 748 (1992).

The elements of a criminal offense may be proven by circumstantial evidence and reasonable inferences arising from that evidence. *People v Nowack*, 462 Mich 392, 400; 614 NW2d 78 (2000). All conflicts in the evidence must be resolved in favor of the prosecution. *Id*. Even when defendant offers explanations and alternative theories for viewing the evidence, it is up to the trier of facts to weigh the evidence and determine the credibility of the witnesses. *People v Williams*, 268 Mich App 416, 419; 707 NW2d 624 (2005).

Defendant was convicted of three charges: second degree murder, MCL 750.317; felon in possession of a firearm, MCL 750.224f; and, felony firearm, MCL 750.227b. Defendant does not specifically challenge his convictions of felon in possession or felony firearm. To convict a defendant of second degree murder the prosecutor must prove each of the following elements beyond a reasonable doubt: "(1) a death, (2) caused by an act of the defendant, (3) with malice, and (4) without justification or excuse." *People v Mayhew*, 236 Mich App 112, 125; 600 NW2d 370 (1999). As to the first element, there is no dispute that a death occurred. The parties stipulated that Allen was a victim of homicide and the medical examiner who conducted an autopsy on Allen testified that Allen's, manner of death was homicide, caused by multiple fatal gunshot wounds.

The second element is most at issue in the present case. Defendant argues that there is no evidence proving that he was the person that killed Allen, though he admitted to being present when Allen was killed. We are satisfied that the record reflects sufficient circumstantial evidence that defendant was involved in Allen's murder.

Allen's girlfriend, Felicia Whitted, testified at trial that she and Allen were at defendant's home with defendant and Reeves on the night at issue. She also testified that she heard Allen, in an accidental phone call, yell that he would kill "you and your son" and that Reeves thereafter stated, in her presence, that he was "going to have to kill a n***** tonight." There was additional testimony by a friend of Allen, Gregory Montgomery, that defendant and Allen were drunkenly arguing and wrestling, albeit like they had in the past, that evening. The above presents circumstantial evidence that the night was fraught with aggression between defendant and Allen.

April Sandell, whom the trial court found to be a credible witness, testified that Reeves told her that defendant had told him that Allen had been shot at the house and that Reeves needed to get rid of the body, the house, and the Mustang. While Sandell did not testify that Reeves told her that defendant had a gun or that defendant killed Allen, the trial court viewed Sandell's testimony in light of defendant's statements to police wherein he omitted mentioning that Reeves was even at defendant's home on the evening at issue, and the changing stories defendant provided to police about what had happened.

In his January 15, 2015, interview with police, defendant stated that Allen had invited several men, whom defendant did not know, to defendant's home the night before. Defendant stated that the men arrived in a black van and that at some point, one of the men accused Allen of shooting "one of his people." The man grabbed an AK-47 that was at defendant's home and shot Allen while he was next to defendant on the living room floor. Defendant also explained to police that the unknown men forced him to assist in putting Allen's body in the trunk of defendant's Mustang, two of the men then drove off in the Mustang and returned a short time later with the car. Defendant told police that he then removed several items from the home and drove the Mustang to his mother's house. The trial court found, and this Court agrees, that some of the details of defendant's explanation changed throughout the course of the interview. Defendant's credibility was a matter for the trial court, sitting as the trier of fact, to evaluate and it found that defendant was not credible. "This Court will not interfere with the trier of fact's role of determining the weight of the evidence or the credibility of witnesses." *Williams*, 268 Mich App at 419.

The physical evidence and testimony concerning the same lend significant support to the trial court's finding that defendant was at least one of the people involved in Allen's death. The record establishes that Allen's blood was found on money defendant had on his person when he was arrested and was also found on defendant's jacket and in the trunk of defendant's Mustang. Defendant's proffered exculpatory explanations for why he had Allen's blood on his money (because the four men forced him and Allen to empty their pockets, but allowed defendant to pick up the money after Allen was killed next to him), and for why he would potentially have gun powder residue on his hands from the AK-47 used to kill Allen (because he may have taken the gun with him when he left the home after Allen's death) were all weighed in evaluating defendant's credibility, which the trial court found to be non-existent. The trial court carefully and fully explained why it found defendant's statements to police regarding the events of the evening to be incredible and why it found that the circumstantial evidence indicated defendant's guilt. Inferences of guilt may be drawn from circumstantial evidence which if well authenticated can be as effective as direct evidence. *People v Eaves*, 4 Mich App 457, 145 NW2d 260 (1966); *People v Iron*, 26 Mich App 235, 182 NW2d 342 (1970).

-11-

Turning to the third element necessary to prove second degree homicide, "[m]alice is defined as the intent to kill, the intent to cause great bodily harm, or the intent to do an act in wanton and willful disregard of the likelihood that the natural tendency of such behavior is to cause death or great bodily harm." *People v Goecke*, 457 Mich 442, 464; 579 NW2d 868 (1998). Malice may be "inferred from evidence that the defendant 'intentionally set in motion a force likely to cause death or great bodily harm.' " *Mayhew*, 236 Mich App at 125, quoting *People v Djordjevic*, 230 Mich App 459, 462; 584 NW2d 610 (1998). Intent to kill may be inferred from all the facts in evidence, including the use of a deadly weapon. See *People v Carines*, 460 Mich 750, 759; 597 NW2d 130 (1999). Minimal circumstantial evidence is sufficient to show an intent to kill, and that evidence can include a motive to kill, along with flight and lying, which may reflect a consciousness of guilt. *Unger*, 278 Mich App at 223, 225–227.

Here, the court found that the multiple gunshot wounds on Allen were indicative of an intent to kill. The trial court also found that the acts of dumping Allen's body in the street and burning down defendant's house indicated an attempt to cover up the crime and destroy evidence and that Allen's blood on defendant's money, defendant's jacket, and in the trunk of defendant's car also showed that defendant was the one who dumped Allen's body or made sure it was dumped. We find no error in this conclusion.

As to the last element in a second degree homicide prosecution (that the killing was without justification or excuse, see *Mayhew*, 236 Mich App at 125), defendant claims that he was not the murderer, therefore he does not additionally argue that he has a justification or excuse for killing Allen. The trial court also noted that there was no testimony or evidence that Allen's killing was excusable or that there was any justification or defense for the killing. This element was thus not at issue. Given the evidence and testimony, and giving due deference to the trial judge's ability to judge the credibility of witnesses, there was sufficient evidence to find defendant guilty of second degree murder.

Defendant's last argument on appeal is that he was denied the effective assistance of counsel. Defendant failed to preserve this issue for appeal by moving in the trial court for a *Ginther*[4] hearing or for a new trial based on the ineffective assistance of counsel. We review this unpreserved issue of ineffective assistance of counsel for mistakes apparent on the record. *People v Petri*, 279 Mich App 407, 410; 760 NW2d 882 (2008).

To prevail on a claim of ineffective assistance of counsel, a defendant must, at a minimum, show that (1) counsel's performance was below an objective standard of reasonableness and (2) a reasonable probability that the outcome of the proceeding would have been different but for trial counsel's errors. *People v Ackerman*, 257 Mich App 434, 455; 669 NW2d 818 (2003). Defendant has failed to make this minimum showing.

Defendant's first claim of ineffective assistance is that trial counsel failed to file a pretrial motion concerning statements Sergeant Eby falsely attributed to defendant in his police report and failed to impeach Sergeant Eby's testimony concerning these statements at trial. This

---

[4] *People v Ginther*, 390 Mich 436; 21 Nw2d 922 (1973).

argument fails because on August 21, 2015, defense counsel filed a motion to dismiss due to allegedly false statement by Sergeant Eby in his report and defense counsel further cross-examined Sergeant Eby at length during trial about the statements.

Defendant next claims that counsel was ineffective for failing to investigate a shooting that allegedly took place just weeks before Allen's death, in which Allen allegedly shot someone. Defendant contends that it is possible that some of the ballistic evidence collected by the police was connected to that prior shooting. However, defendant failed to attach any police report or affidavit, or any other evidence that Allen had actually shot someone at some point prior to his death or that any ballistic evidence collected by police would be related to that alleged shooting. As our Supreme Court stated in *People v Hoag*, 460 Mich 1, 6; 594 NW2d 57 (1999), "[D]efendant has the burden of establishing the factual predicate for his claim of ineffective assistance of counsel" and:

> [a] convicted person who attacks the adequacy of the representation he received at his trial must prove his claim. To the extent his claim depends on facts not of record, it is incumbent on him to make a testimonial record at the trial court level in connection with a motion for a new trial which evidentially supports his claim and which excludes hypotheses consistent with the view that his trial lawyer represented him adequately." [*Hoag*, 460 Mich at 6, quoting *People v Ginther*, 390 Mich at 442-443; 212 NW2d 922 (1973)]

Defendant has failed to provide the factual predicate for his claim of ineffective assistance of counsel in this regard.

Next, defendant argues that counsel was ineffective because he failed to interview witnesses April Sandell, Gregory Montgomery, Felicia Whitted, Trinia Grant and Beverly Allen who had all given statements to the police, to determine if they had any exculpatory evidence. Defense counsel's failure to exercise reasonable professional judgment when deciding to forgo particular investigations relevant to the defense, can amount to ineffective assistance of counsel. *People v Trakhtenberg*, 493 Mich 38, 53; 826 NW2d 136 (2012). "Failure to call a witness only constitutes ineffective assistance of counsel if it deprives the defendant of a substantial defense." *People v Dixon*, 263 Mich App 393, 398; 688 NW2d 308 (2004).

Again, defendant has failed to provide any factual basis for asserting that these witnesses had any exculpatory evidence and thus has failed to provide the factual predicate to this claim. *Hoag*, 460 Mich at 6. In any event, Gregory Montgomery provided evidence at trial that was favorable to defendant or at least not unfavorable. He testified that he saw Allen with his usual nine mm gun at defendant's home on the night at issue and saw him fire it in the air. Montgomery also testified that he heard additional shots outside. Montgomery testified that all of the gun activity he heard took place while Allen was outside and defendant was inside the house and that he did not see defendant with a gun that night. Montgomery further testified that defendant and Allen were play-wrestling while drunk, as they usually did, but were laughing and talking after.

Whitted testified that she also saw Allen with a gun that night, knew him to always carry a gun, and later heard Allen yell "I'll kill you and your son" during an accidental call to her before the call hung up. Whitted further testified that Reeves said to her later that night "I'm going to have to get my gun and kill a n***** tonight." Thus, Whitted's testimony was not necessarily negative to defendant, and defendant has not established that she had or would give testimony that was specifically exculpatory.

Eva Allen (presumably whom defendant means when he refers to "Beverly Allen") testified that she had seen defendant with assault rifles and guns in the past, and had seen Allen with a nine mm handgun. She further testified that defendant and Allen were known to get drunk and wrestle in the past, but were still friendly. Allen's testimony was minimally important as she gave no frame of reference for defendant's possession of guns and was not there on the January 15, 2015.

April Sandell testified that she had met defendant a few times but did not give any evidence directly inculpating him. In fact, her testimony was that Reeves told her that someone else had shot Allen at defendant's home while defendant was there and that defendant did not know why that person killed Allen. Sandell's testimony was, for the most part, then that defendant perhaps tried to cover up Allen's murder, but had no participation in it. Sandell did not relate that she was at defendant's home during the events at issue and defendant has provided no factual predicate for believing that Sandell could have provided any more exculpatory evidence for defendant than she already had.

Defendant has not identified who Trinia Grant is, she did not testify at trial, and defendant has provided no indication whatsoever as to what, if any, exculpatory testimony Grant could have provided. Lacking the factual predicate for his claims that counsel's failure to interview witnesses constituted ineffective assistance of counsel, defendant's argument fails.

Finally, defendant contends that counsel was ineffective for failing to obtain all of the reports in this case, some of which defendant notes indicate that the events took place at 6130 Casmere, when the offenses actually occurred at 13732 Dwyer. Defendant attached an investigator's report dated January 16, 2015, to support his position. The report, on the "Place of Offense" line indicates "R/O 6130 Casmere, Detroit MI." The narrative of the report notes that police received a call to go to the area of Harold and Dwyer, where a body was in the street. The narrative further indicated that they had received information that on January 14, 2015, the deceased was at 13732 Dwyer, celebrating defendant's birthday and his body had been found approximately ½ mile from the that house.

At trial, Sergeant Timothy Kirchau testified that the Casmere location provided on the report is due to "real time crime reporting." He explained that "[y]ou have to have an accurate address so it goes into real time crime reporting , so I had to pick an address and point, and knowing the address to the auto pound, I knew it was right behind that so that's why I used the

Casmere address." Officer Derrick Mason testified to the same regarding his report. Defendant does not dispute this explanation, nor does he establish that his counsel did not have the report or explain how the use of the Casmere address in the reports prejudiced him.

We affirm.

/s/ Douglas B. Shapiro
/s/ Deborah A. Servitto
/s/ Michael F. Gadola